880 F.2d 1531
 1989 A.M.C. 2419, 58 USLW 2091, 113
Lab.Cas. P 11,517,
11 Employee Benefits Ca 1313
 KOREA SHIPPING CORPORATION, Plaintiff-Appellant,
v.
NEW YORK SHIPPING ASSOCIATION--INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION PENSION TRUST FUND and the Board of
Trustees of the NYSA-ILA Pension Trust
Fund, Defendants-Appellees.
DELTA STEAMSHIP LINES, INC., Plaintiff-Appellant,
v.
NEW YORK SHIPPING ASSOCIATION-INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION PENSION TRUST FUND, the Board of Trustees of the
New York Shipping Association International Longshoremen's
Association Pension Trust Fund, Defendants-Counterclaim
Plaintiffs-Appellees,
Delta Steamship Lines, Inc., Crowley Maritime International
(Inc) and Crowley Maritime Corporation,
Counterclaim Co-Defendants Appellants.
 Nos. 339, 497, Dockets 88-7636, 88-7774.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 5, 1988.
Decided July 24, 1989.
 
 John D. Kimball, New York City (Healy & Baillie, LeRoy Lambert, of counsel), for plaintiff-appellant Korea Shipping Corp.
 Donato Caruso, New York City (C. Peter Lambos, Lambos & Giardino, New York City, of counsel), for defendants-counterclaimplaintiffs-appellees.
 Ernest L. Mathews, Jr., New York City (Thomas W. Gleason, New York City, of counsel), for defendants-counterclaim plaintiffs-appellees.
 Stephen E. Tallent, Washington, D.C. (Paul D. Inman, Gibson, Dunn & Crutcher, Washington, D.C., of counsel), for plaintiff-appellant Delta Steamship Lines, Inc.
 Before OAKES, KEARSE and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 We consider two separate appeals presenting identical legal issues: Whether appellants shipping companies are "employers" under the Multiemployer Pension Plan Amendments Act (MPPAA or the Act), 29 U.S.C. Sec. 1381 et seq. (1982), and whether they are therefore subject to "withdrawal liability" under that Act upon ceasing their operations in the Port of New York. The carriers' chief contention is that Congress' use of the term "employer" requires us to construe that word as it is generally understood in the common law, and that under that definition they are not employers for purposes of MPPAA withdrawal liability. On appeal, they argue in effect that the trial courts' wholly different reading of the word employer reinforces the notion that words don't mean what they say but only, as Alice tells us, what we say they mean. See L. Carroll, Alice's Adventures in Wonderland (London 1865).
 Appellant Korea Shipping Corporation (Korea) appeals a grant of summary judgment in favor of defendants, the New York Shipping Association-International Longshoremen's Association Pension Trust Fund (Fund) and its Board of Trustees, that held appellant to be an employer subject to withdrawal liability under the MPPAA. The district court decision, entered on June 25, 1987 by the United States District Court for the Southern District of New York (Weinfeld, J.), reported at 663 F.Supp. 766, was reaffirmed following Judge Weinfeld's death on a motion for reconsideration by Judge Conboy of the Southern District on June 8, 1988. Appellant Delta Steamship Lines (Delta) appeals a similar determination entered on April 5, 1988 in the same district court (Leisure, J.), reported at 688 F.Supp. 1560.
 
 
 1
 These suits were commenced by the carriers as declaratory judgment actions in which they sought rulings that they were not employers under the MPPAA. In both actions, the Fund counterclaimed for the amounts allegedly due as the carriers' withdrawal liabilities. The parties cross-moved for summary judgment on the employer issue in each case, and in both instances the Fund prevailed. The carriers appeal the district court's determinations that as MPPAA employers ceasing operations in the Port of New York they are subject to withdrawal liability. We affirm.
 
 FACTS
 A. Operations at the Port of New York
 
 2
 The only real dispute between the parties is appellants' status as employers under the MPPAA, and the facts necessary to its resolution are largely agreed upon. To put this issue in proper perspective, it is necessary to examine briefly the unique history of the longshore industry in the Port of New York.
 
 
 3
 Appellants' vessels called at the Port's marine terminals that are owned and operated by stevedoring companies engaged in the business of loading and unloading ships. A registered pool of longshore employees is available to work the vessels of any carrier; the longshoremen constitute a "floating" work force whose employers change frequently and whose seniority and eligibility for fringe benefits are determined on the basis of their work throughout the Port, not by attachment to any particular company. Carriers provide the work and their ships the workplace. The longshoremen's union negotiates collective bargaining agreements with the stevedoring companies and the carriers that establish the terms and conditions of the longshoremen's employment in the Port.
 
 
 4
 In litigation concerning whether the Rules on Containers and the work preservation provisions in the longshore contract constituted unlawful secondary activity under Secs. 8(b)(4)(B) and 8(e) of the National Labor Relations Act, the carriers were recognized to be longshore employers. See NLRB v. Int'l Longshoremen's Ass'n, 447 U.S. 490, 496 n. 10, 100 S.Ct. 2305, 2309 n. 10, 65 L.Ed.2d 289 (1980); id. at 499 n. 13, 100 S.Ct. at 2311 n. 13; id. at 512, 100 S.Ct. at 2317 (1980); see also NLRB v. Int'l Longshoremen's Ass'n, 473 U.S. 61, 74 n. 12, 105 S.Ct. 3045, 3053 n. 12, 87 L.Ed.2d 47 (1985). In the Port of New York, the National Labor Relations Board (NLRB) has certified the New York Shipping Association, Inc. (NYSA) as a bargaining unit. Although NYSA's membership consists of carriers, stevedoring companies, carrier agents, and other maritime concerns, the NYSA has historically been under the control of its carrier members.
 
 
 5
 The obligation for funding the costs of the longshoremen's fringe benefits has been imposed by contract upon the carriers, not on the stevedoring companies. The bitter collective bargaining conflict between the carriers and the International Longshoremen's Association (ILA) sparked by the introduction of containerized methods of cargo handling was finally resolved in 1968 after a lengthy strike and the intervention of a presidential mediator. The labor accord reached required the union to relinquish its demands for limits on containerization in exchange for, among other things, the establishment of a program of enhanced fringe benefits to compensate longshoremen for the effects of the job displacement caused by containerization.
 
 
 6
 Thus, the advent of containerization and the execution of the 1968 labor contract brought about significant new developments in the carriers' status in the Port of New York. From 1968 to the present the carriers not only continued to negotiate the terms and conditions of longshore employment and the level of longshore employee benefits, but also directly undertook the obligation to pay--and did in fact pay--the contributions necessary to fund these benefits. The key feature of the assessment system in effect in the Port of New York for the past two decades is that the obligation for longshore fringe benefit assessments is placed directly upon the vessel carriers based on the tons of cargo loaded and unloaded by longshoremen from their vessels.
 
 
 7
 Korea and Delta engaged in steamship carrier operations at the Port from 1967 to 1985 and 1978 to 1983 respectively, undertaking a variety of operations which included the loading and unloading of their general cargo and container vessels. Neither company directly employed its own labor force to service its ships, and neither operated its own marine terminal facility. When appellants' ships entered the Port, they called at terminals operated by the stevedoring companies where their vessels loaded and discharged their cargo with the aid of longshoremen directly employed by the stevedoring companies.
 
 B. Collective Bargaining Agreements
 
 8
 Operations at the Port are carried out under two collective bargaining agreements--(1) the so-called "master contract," encompassing operations at major ports on the Atlantic and Gulf coasts of the United States, and (2) a local New York labor accord known as the General Cargo Agreement (GCA). The master contract governs the general terms of employment that apply uniformly in eastern ports where the ILA functions. Both agreements were negotiated by the ILA as the representative of the rank and file longshoremen and by the New York Shipping Association and its counterpart organizations in other eastern ports as the representatives of the carriers, the stevedores, and other employers of longshoremen.
 
 
 9
 The master contract sets uniform terms applicable to ports in which the ILA functions and covers such items as wages, hours, pension and welfare contributions, containerization agreements, and the payment of "job security program assessments" as a means of offsetting shortfalls in contributions to, inter alia, longshoremen pension funds. As members of the NYSA, Korea and Delta were parties to the master contract and, in some instances, were also direct signatories. The General Cargo Agreement, also a product of bargaining between the ILA and the NYSA, governs the local terms and conditions of employment in the Port of New York such as pension benefits, seniority, hiring, safety, and holidays. As is the case with the master contracts, plaintiffs are parties to the GCA not only by reason of their membership in the NYSA, but also as direct signatories.
 
 
 10
 As previously noted, in signing the master contract and the GCA the carriers obligated themselves to pay "job security program assessments" in order to aid in the funding of shortfalls in certain longshore pension, welfare, and trust funds. In addition to these job security program assessments provided for by the master contract, the GCA imposed other cargo assessments in the Port of New York which from 1974 to 1985 were based solely on tonnage and were paid by the carriers to the NYSA. The NYSA, in turn, paid most of those monies to the NYSA-ILA Fringe Benefits Escrow Fund. It transferred directly to the Fund that portion of the assessment monies to be used for pension plan contributions it had collected from its members. The GCA fixed a guaranteed minimum level of total annual contributions that was designed to ensure the availability of adequate funding for future retirement benefits. In relevant part, the GCA provided
 
 
 11
 This agreement shall be executed by the ILA for and on behalf of itself and its affiliated Locals and by New York Shipping Association, Inc. for and on behalf of its employer-members and by each contacting stevedore and vessel carrier who directly or indirectly utilizes the services of any employees covered by this agreement and who by such execution binds itself and its successors to each and every term and condition of the agreement, including, without limitation, the contribution of its proportionate share of the hourly, tonnage and other supplemental and fringe benefit contributions provided herein. If any carrier does not subscribe to this and the accompanying JSP Agreements, the ILA shall have the right not to work on the loading and discharging of its ships or any work ancillary thereto.
 
 
 12
 General Cargo Agreement, October 1, 1980 to September 30, 1983, at 73-74.
 
 
 13
 In addition, the GCA provided that each carrier would be subject to an assessment calculated according to a predetermined formula based on the tonnage of cargo loaded or discharged by the carrier in the Port. The agreement set forth the procedures for collection and payment of tonnage assessments:
 
 
 14
 Such tonnage assessment shall be collected by the direct employer from each of the carriers and shall be paid to the NYSA for immediate transmittal to the NYSA-ILA Fringe Benefits Escrow Fund ... as collected by said direct employers. Pension payment shall be made by the NYSA directly to the NYSA-ILA Pension Trust Fund. Amounts billed to carriers and not collected by the direct employers shall be reported to the NYSA-ILA Fringe Benefits Escrow fund promptly at the end of each billing period.
 
 
 15
 Id. at 118-19. Thus, though the NYSA made the contributions to the Fund, it received the funds directly from the carriers that had obligated themselves contractually to make the payments. The agreement places the obligation for funding the longshoremen's fringe benefits squarely upon the carriers' shoulders. Moreover, the Fund is administered pursuant to an Agreement and Declaration of Trust and Plan which defines employer as any entity obligated under agreements such as the GCA to pay tonnage assessments.
 
 
 16
 Throughout the period when Korea and Delta were actively engaged in business in the Port of New York, they were signatories to and active negotiators of the various labor contracts with the ILA. Until their cessation of operations, appellants regularly complied with their assessment obligations under the GCA. Thus, for the five-year period prior to their withdrawal, they paid assessments of $12.5 million and $10 million, respectively, of which approximately $3.5 million and $3 million constituted pension contributions to the Fund. After the two carriers discontinued operations at the Port of New York, the Fund sought to assess withdrawal liability in accordance with the applicable provisions of the MPPAA. Appellants resisted, arguing that the stevedoring companies were the direct employers of the longshoremen, and that it was those companies that would be responsible for withdrawal liability if and when they ceased serving the New York market.
 
 PRIOR PROCEEDINGS
 
 17
 The three district court judges who ruled on the matter concluded that Korea and Delta were employers subject to withdrawal liability under the MPPAA and therefore granted summary judgment in favor of the Fund. Agreeing with the carriers' contentions that they were not the common law employers of the longshoremen, the district court in each case nonetheless found that the issue of employer status under the MPPAA was not governed by the common law definition. Absent an express definition of employer in the MPPAA itself, and without clear guidance from the legislative history, the district judges believed that the determination of how to construe the term employer was derived from assessing the purposes of the legislation. See NLRB v. Hearst Publications, Inc., 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944).
 
 
 18
 Judges Weinfeld and Leisure accordingly adopted a definition of employer that focused on the obligation to contribute to the pension plan and that imposed withdrawal liability upon the party contractually obligated to make those contributions. They observed that the definition of employer set forth in Title I of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1002(5) (1982 & Supp. V 1987), was not directly applicable to the MPPAA. But the district judges nevertheless drew upon ERISA's definition in holding that the carriers that were contractually obligated to contribute to a plan in the indirect interests of the direct employer (here, the stevedores) could not escape withdrawal liability without threatening "the very effectiveness of the Act." Korea Shipping, 663 F.Supp. at 770 (quoted in Delta S.S., 688 F.Supp. at 1566).
 
 
 19
 In reaching its determinations, the district court correctly observed that to apply a common law definition of employer to the MPPAA would encourage employers to insulate themselves contractually from liability by entering into agreements under which contributions to the pension plans would be made by entities that were not the direct employers of the plan's beneficiaries. Under such a scenario, the contributing indirect employer could terminate its relationship with the direct employer and thereafter withdraw from the plan without incurring withdrawal liability because, pursuant to the definition of employer urged by appellants, the Act would not be applicable to the contributing indirect employer. At the same time, the direct noncontributing employer would also be absolved of withdrawal liability because it would not be deemed to have "withdraw[n] from a multiemployer plan," 29 U.S.C. Sec. 1381(a), in accordance with the meaning given the term "withdrawal" under the MPPAA. See 29 U.S.C. Sec. 1383(a) (defining "withdrawal" as "(1) permanently ceas[ing] to have an obligation to contribute under the plan, or (2) permanently ceas[ing] all covered operations under the plan"). We turn now to analysis of these issues.
 
 DISCUSSION
 A. Definition of Employer
 
 20
 In enacting ERISA in 1974, 29 U.S.C. Sec. 1001 et seq., Congress sought to prevent the losses suffered by employees and their families when vested pension benefits were not paid because a pension plan was terminated before sufficient funds had been accumulated. See Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984); Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 374-75, 100 S.Ct. 1723, 1732-33, 64 L.Ed.2d 354 (1980).
 
 
 21
 Multiemployer plans developed in industries where job changes are frequent, like longshoring "where workers change employers from day to day or week to week." NLRB v. Truck Drivers Local Union No. 449, 353 U.S. 87, 94, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). Collective bargaining agreements with multiple employers are particularly appropriate in such industries because of the pension protection provided by the pooled funds of many employers. See Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 847 (2d Cir.1984). Subsequent concern for the financial stability of some multiemployer plans prompted Congress, in 1980, to enact that provision of the MPPAA which states: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined ... to be the withdrawal liability." 29 U.S.C. Sec. 1381(a).
 
 
 22
 The MPPAA itself contains no definition of the word employer. But Title I of ERISA does contain a definition that would support the Fund's arguments in favor of imposing withdrawal liability upon the carriers, see 29 U.S.C. Sec. 1002(5) (defining such status as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan"). Yet, the Supreme Court cautions that though the definitions in Title I "may otherwise reflect the meaning of the terms defined as used in other Titles," Nachman v. Pension Benefit Guaranty Corp., 446 U.S. at 370 n. 14, 100 S.Ct. at 1731 n. 14, they "do not apply elsewhere in the Act of their own force...." Id. The parties attempt to garner support for their respective positions from the language in Nachman. We conclude that the definition of who is an employer for purposes of determining withdrawal liability under the MPPAA is one that in the final analysis must be left to the courts. See DeBreceni v. Graf Bros. Leasing, Inc., 828 F.2d 877, 880 (1st Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988).
 
 
 23
 Although, as is so often the case, the legislative history of the MPPAA is ambiguous and somewhat contradictory, see H.R.Rep. No. 869, 96th Cong., 2d Sess. 60, reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 2928, the policies and purposes of the MPPAA are clear, and they fully support the rulings of the district court in these cases. The 1980 amendment to ERISA aimed to eliminate the incentive to withdraw from multiemployer plans, and reduced the burdens imposed on plans when employers do withdraw. See id. at 2928, 2933 ("The basic policy of the Act is that the retirement income security of multiemployer plan participants is best assured by fostering the growth and continuance of multiemployer plans.... A primary objective of the legislation is to insulate plans to the extent possible from declines, through sounder funding [and] employer withdrawal liability...."). Thus, in deciding how to define employer, the district court properly considered Congress' remedial and protective purposes in enacting the MPPAA, and correctly concluded that the ends sought to be achieved through the Act's passage would best be served by imposing withdrawal liability on Korea and Delta.
 
 
 24
 In both cases, the trial judges declined to give the term "employer" its common law or dictionary meaning, preferring instead to adopt a definition that more carefully implements the statute's clear objectives. Under this construction, the term employer in 29 U.S.C. Sec. 1381(a) means "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." Korea Shipping, 663 F.Supp. at 770; see also Delta S.S., 688 F.Supp. at 1563-66; accord In re Uiterwyk Corp., 63 B.R. 264 (M.D.Fla.1986). We agree with this definition.
 
 
 25
 The principal thrust of the carriers' argument on appeal is that it is a fundamental rule that inquiry into the meaning of a statute must begin with its plain meaning, that is, by examining the actual words used by the legislature. The word employer is to be construed in its common law sense which, they contend, is free from doubt. When Congress' term is construed in that fashion, appellants continue, it eliminates the carriers as employers of the longshoremen, and shifts the withdrawal liability to the stevedoring companies. This argument is less convincing than it may at first appear.
 
 
 26
 Concededly, the best starting point for examining a statute is the language of the statute itself. Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring). Courts generally assume that the ordinary meaning of the language accurately expresses the legislative purpose. See, e.g., Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). Although inquiry begins with the words, words are not the end of it. See Massachusetts Bonding & Ins. Co. v. United States, 352 U.S. 128, 138, 77 S.Ct. 186, 191, 1 L.Ed.2d 189 (1956) (Frankfurter, J. dissenting). As this case illustrates, to adopt the meaning of the word employer appellants urge would open a gaping hole in many multiemployer plans. Such a common law definition of employer would eliminate withdrawal liability for such a significant number of contributors as to threaten those plans' financial viability and potentially make them victims of the precise threat Congress aimed to shield them from when it enacted the MPPAA. See Korea, 633 F.Supp. at 769 (quoted in Delta S.S., 688 F.Supp. at 1563).
 
 
 27
 Rather, it is the task of judges to start with the language of a statute and to reach a judgment that applies that language to a particular set of circumstances in a manner consistent with the statute's stated objectives. The fallacy in the carriers' argument is their failure to recognize that in construing a statute, the task of the courts is to interpret the words of the statute in light of the purposes that animated the lawmakers in enacting it. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). It is in this broader framework that the word employer was properly defined by the district courts as one obliged to contribute to a plan for the benefit of the plan's participants. Such a definition is fully consonant with the MPPAA's objectives.B. Objections to Obligation to Contribute Definition
 
 
 28
 The carriers have raised additional objections to the obligation to contribute definition that triggers withdrawal liability. They argue that this standard conflicts with the proscriptions contained in Sec. 302 of the Labor Management Relations Act, 29 U.S.C. Sec. 186 (1982 & Supp. V 1987), which they contend prohibits the carriers from making any payments to the Fund. And, the carriers further claim that a showing of harm to the pension plan is a prerequisite to the imposition of withdrawal liability, that the Fund has failed to demonstrate such harm, and that compelling the carriers to make payments to the Fund constitutes an impermissible windfall. We consider these contentions.
 
 
 29
 First, Sec. 302(a) of the LMRA provides, in part, that "[i]t shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value" to an employee representative under certain enumerated circumstances. 29 U.S.C. Sec. 186(a). In essence, the carriers urge that the common law definition of employer applies to the LMRA, and again argue that the same definition must also be applied to the MPPAA to avoid a situation in which the same contributions supposedly rendered illegal under Sec. 302 would nonetheless provide the basis for withdrawal liability under the MPPAA.
 
 
 30
 Nothing in the LMRA supports such a contention. Appellants' argument ignores the provisions of Sec. 302(c)(5) that exempt from the Sec. 302(a) prohibition those contributions "to a trust fund established by [a labor] representative, for the sole and exclusive benefit of the employees of such employer...." 29 U.S.C. Sec. 186(c)(5). Contributions may be made legally to the Fund under the exception carved out by Sec. 302(c)(5). Although the plaintiffs are not the direct employers of the plan's beneficiaries, they did make payments for the employees' benefit to the Fund as members of an association of employers.
 
 
 31
 In addition, the carriers' argument disregards the policies and purposes of this section of the LMRA which was enacted to guard against corruption in the collective bargaining process through, among other things, the bribery of employee representatives and abuses of power by union officers. See Arroyo v. United States, 359 U.S. 419, 425-26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959). We cannot adopt the carriers' argument that the employees mentioned in Sec. 302(c)(5) must invariably be the payor's own employees. Inasmuch as the entity making the payments described in Sec. 302(a) may simply be one which "acts in the interests of an employer," and because the language of Sec. 302(c)(5) refers to the "employees of such employer," it plainly appears that the beneficiaries of trust funds covered by the exception in Sec. 302(c)(5) need not be direct employees of the payor contemplated in Sec. 302(a).
 
 
 32
 The carriers' reliance on Walsh v. Schlecht, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), should give them no comfort. There, the terms of a labor agreement required a contractor to make contributions to a carpenter's trust fund on the basis of the number of hours worked by a non-signatory subcontractor's employees. Although ruling that the contributions did not violate Sec. 302 of the LMRA because the benefits were payable only to employees of signatories to the labor agreement, the Supreme Court also held that payments made "on behalf of" or "for the benefit of" the subcontractor's employees would violate Sec. 302(a) because those employees were not eligible for benefits. Walsh, 429 U.S. at 407, 97 S.Ct. at 684. Here, appellants were parties to the agreement that created the Fund, and benefitted from using the labor of the Fund's beneficiaries who were employed by stevedoring companies that were also signatories to the same agreement. See Delta, 688 F.2d at 1566 n. 6. Thus, under the present circumstances a carrier may be obligated for withdrawal liability payments to a pension trust fund to benefit eligible employees of another employer, even though its own employees are not the benefic aries of that fund. See, e.g., Spring Branch Mining Co. v. United Mine Workers, 691 F.Supp. 973, 976-78 (S.D.W.Va.1987), aff'd, 854 F.2d 37 (4th Cir.1988) (per curiam), cert. denied, --- U.S. ----, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989); Warrior Coal Co. v. Connors, 649 F.Supp. 1090, 1096-97 (W.D.Va.1986).
 
 
 33
 Second, the carriers claim that there must be demonstrable harm to the Fund to justify the imposition of withdrawal liability. In light of the MPPAA's policies, and the payments expressly mandated by the statute, there is no unjust enrichment upon receipt of such payments without a showing of harm. This follows because withdrawal liability is designed as a compensatory mechanism to counterbalance shrinkages in the contribution base of covered plans--shrinkages such as those that occurred here when the carriers withdrew from the Port of New York. See Central States S.E. & S.W. Areas Pension Fund v. Bellmont Trucking Co., 788 F.2d 428, 433 (7th Cir.1986). Thus, the Fund need not prove specific harm resulting from the withdrawals; the very act of withdrawal alone suffices because it could well begin the vicious cycle of withdrawals that Congress sought to prevent in enacting the MPPAA. See Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 216, 106 S.Ct. 1018, 1021, 89 L.Ed.2d 166 (1986).
 
 C. Plaintiffs' Obligation to Contribute
 
 34
 Having concluded that the contributing obligor definition of employer is appropriate under the MPPAA, we next turn to the issue of whether Korea and Delta have such an obligation. Appellants assert that even using this definition as the test, they cannot be subjected to withdrawal liability because, under their collective bargaining agreements, they have no direct obligation to contribute to the Fund. We disagree.
 
 
 35
 As noted earlier, in signing the General Cargo Agreement the shippers obligated themselves to pay certain assessments to the NYSA which, in turn, transferred that portion of the assessment monies to be used for pension plan contributions directly to the Fund. Appellants take slightly different tacks in challenging withdrawal liability: Korea asserts that payment of a tonnage assessment was always the stevedores' obligation. It argues that Judge Weinfeld's decision was based upon a practice that had developed whereby the carriers paid tonnage assessments directly to the NYSA, and professes disbelief that multi-million dollar questions of withdrawal liability would hinge on "local billing practices." Delta rechristens the payments it made to the NYSA as being "cargo assessments" and claims that these payments were not obliged contributions to the Fund. Each contend therefore that they had no obligation to contribute to the Fund, and that it is the NYSA which fulfills the obligation to fund the ILA pension plans.
 
 
 36
 As the Fund correctly points out, the General Cargo Agreement states that "[e]ach vessel carrier ... shall be responsible for an assessment amount per ton on each ton of non-excepted cargo loaded or discharged in the Port of New York," that those assessments "shall be collected by the direct employer [the stevedores] from each of the carriers and shall be paid to NYSA for immediate transmittal to the NYSA-ILA Fringe Benefits Escrow Fund," and that "[p]ension payments shall be made by NYSA directly to the NYSA-ILA Pension Trust Fund." These contractual provisions amply support the conclusion that the stevedores and the NYSA were merely conduits for monies which the carriers were obligated to pay into the longshoremen's pension fund.
 
 
 37
 The fact that the NYSA was the party that transferred the monies to the Fund is irrelevant. The contributions were received directly from the carriers under the GCA for the express purpose of funding the NYSA-ILA pension plan. We agree with the district courts' observation that to hold that NYSA but not its members must make contributions to the Fund elevates form over substance, and effectively permits contributors to a multiemployer plan to conveniently insulate themselves from withdrawal liability. "The mere existence of an intermediary used to collect and distribute the separate contributions of its members does not remove those members from the status of contributors to the plan." Korea, 663 F.Supp. at 771; see also Delta, 688 F.Supp. at 1566.
 
 
 38
 In short, the determination that Korea and Delta were subject to withdrawal liability was firmly bottomed on the express terms of the GCA and clear congressional purpose in enacting the MPPAA's withdrawal liability provisions. To rule otherwise would effectively undermine the very aims and purposes for which the Act came into being.
 
 D. Proportional Relationship
 
 39
 Finally, Delta urges that the assessments it paid to the NYSA must bear a proportional relationship to the number of man-hours dedicated to the loading or unloading of its cargo and, absent such proportionality, the amount of the contributions made to the plan through the NYSA cannot serve as the basis for the imposition of withdrawal liability. The statute and the relevant decisional authority are conspicuously silent on this proportionality argument. Congress chose contributions as the basis for allocation of withdrawal liability. It did not regulate the nature or method of those contributions. The method of contribution was left to the parties.
 
 
 40
 Once the contributions are agreed upon and made, they become the focus by which the withdrawing contributor's share of the plan's unfunded vested benefits pursuant to 29 U.S.C. Sec. 1391 is determined. The structure of wages, assessments, and benefits may not appear wholly rational and consistent. Yet the carriers, the stevedores, and the longshoremen negotiated and agreed upon that structure, and any disproportion between the number of man-hours worked and the tonnage assessments must be deemed to represent the equilibrium that was reached among contending forces in the bitter economic struggle over containerization. In our view the MPPAA simply accepts the parties' contractual arrangement and imposes withdrawal liability upon the party that has assumed an obligation to contribute to the pension fund.
 
 CONCLUSION
 
 41
 In accordance with Judge Leisure's decision in Delta, the parties to that action are directed to proceed with arbitration, initiated by Delta under 29 U.S.C. Sec. 1401, for the purpose of determining the amount of Delta's withdrawal liability. With respect to Korea, appellees claim that this carrier waived its right to arbitration regarding the amount of its withdrawal liability. We are unable on the record before us to determine whether such a waiver has, in fact, occurred and therefore remand that case to the district court for it to make that determination. The judgments are otherwise affirmed.