**Charles SCHAFFER**

v.

**EAGLE INDUSTRIES, INC.**

**CIV. A. No. 89–1995.**

United States District Court, E.D. Pennsylvania.

Nov. 21, 1989.

James J. Leyden, Frank C. Sabatino, Philadelphia, Pa., for plaintiffs.

Kenneth C. Frazier, Drinker Biddle & Reath, Philadelphia, Pa., for defendants.

Lisa Bazemore, Morgan, Lewis & Bockius, Philadelphia, Pa., for Eagle Industries.

MEMORANDUM

NEWCOMER, District Judge.

Before the court is a motion for summary judgment by defendant Eagle Industries, Inc. For the reasons that follow, the court will deny the motion.

## I. *Background*

This is an action to collect withdrawal liability allegedly owed to the Teamsters Pension Trust Fund of Philadelphia and Vicinity (the Fund) (of which plaintiff Schaffer is the Administrator), brought pursuant to the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381–1453, and specifically, § 1451 (Civil actions). Because the Fund has settled with defendant Transpersonnel, Inc., only Eagle Industries, Inc. (Eagle) remains as a defendant.

As recently stated by the Third Circuit Court of Appeals, the MPPAA was:

Congress' response to the growing problem of financial insolvency of multiemployer pension plans caused by the withdrawal of contributors, and was aimed at protecting the financial integrity of these plans by requiring that withdrawing employers pay a withdrawal liability sum. An employer is deemed to have "completely withdrawn" from a plan when it either "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). The withdrawing employer is liable to the plan for its allocable share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391.

Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme. Thus, the statute provides that "[a]s soon as practicable after an employer's complete or partial withdrawal," the plan is required to determine the amount of withdrawal liability, notify the employer of its assessment, and demand payment. 29 U.S.C. § 1399(b)(1)....

If the employer [is] dissatisfied with the plan's determination, MPPAA provides for the resolution of the dispute through arbitration.... If arbitration is not initiated within the specified time period, the amount demanded by the plan "shall be due and owing." 29 U.S.C. § 1401(b).

*Crown Cork & Seal v. Central States Pension Fund,* 881 F.2d 11, 13–14 (3d Cir.1989) (citation and footnote omitted).

Eagle is a successor to Clevepak Corporation, an entity which formerly maintained a facility within the jurisdiction of the Fund. In operating the facility, Clevepak required truck drivers to make pickups and deliveries. Rather than placing drivers on its payroll, Clevepak entered into contractual arrangements with other companies who "leased" drivers to Clevepak on a full-time basis. There were two such leasing arrangements, one with Milwaukee Driver Service, Inc. (MDS) (covering the period up to June 1981) and another with Transpersonnel (in effect from July 1981 to April 1983). Plaintiff's Brief in Opposition at 3.

## II. *Discussion*

The issues before the court are: (1) whether Eagle was an "employer" within the meaning of the MPPAA who should be required to submit its dispute to arbitration; (2) whether Eagle is obligated to make interim payments of withdrawal liability; and (3) whether the Fund is entitled to costs and attorneys' fees.

### A. *Was Eagle an "Employer" within the Meaning of the MPPAA?*

■ The MPPAA provides for the assessment of withdrawal liability against an "employer" who withdraws from a multiemployer pension plan. 29 U.S.C. § 1381(a). The MPPAA itself contains no definition of the word "employer." *Korea Shipping Corp. v. New York Shipping Ass'n,* 880 F.2d 1531, 1536 (2d Cir.1989). Whether an entity is an employer for purposes of the MPPAA is a legal matter for the court. *See IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 129 (3d Cir.1986) (corporation that disputed its designation as an MPPAA

"employer" could bring a declaratory judgment action to have that question resolved by the court); *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia,* 830 F.2d 1241, 1250–51 (3d Cir.1987) (noting that other courts have resolved employer status questions prior to arbitration); *Korea Shipping,* 880 F.2d at 1536–37 (issue of whether entities were MPPAA employers appropriately resolved in declaratory judgment action); *Tri–State Rubber & Equipment, Inc. v. Central States Southeast & Southwest Areas Pension Fund,* 661 F.Supp. 46 (E.D.Mich.1987) (refusing to send employer status issue to arbitration).

The Fund cites several cases in support of its belief that Eagle was an MPPAA employer. In *Korea Shipping Corp. v. New York Shipping Ass'n.,* 880 F.2d 1531 (2d Cir.1989), two "carriers" (shipping companies) sought determination of their status as MPPAA employers. When the shipping companies called at New York harbors, they engaged stevedoring companies to load and discharge cargo. The stevedoring companies, in turn, hired longshoremen to carry out these tasks. The longshoremen's union negotiated collective bargaining agreements with the stevedoring companies and the carriers that established the conditions of the longshoremen's employment. The obligation for funding the costs of the longshoremen's fringe benefits was imposed by contract upon the carriers, not on the stevedoring companies. The carriers negotiated the terms and conditions of longshore employment and also undertook the obligation to pay, and did in fact pay, the contributions necessary to fund these benefits.

Affirming the district court determinations that the carriers were MPPAA employers, the Second Circuit adopted the definition of employer as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Id.* at 1537 (quotation and citation omitted); *accord In re Uiterwyk Corp.,* 63 B.R. 264 (M.D.Fla.1986).[1] To adopt a plain meaning of the word, the court indicated, without consideration of the purposes for which the statute was enacted, would "open a gaping hole in many multiemployer plans ... and would eliminate withdrawal liability for such a significant number of contributors as to threaten those plans' financial viability and potentially make them victims of the precise threat Congress aimed to shield them from when it enacted the MPPAA." *Id.*[2]

Finally, the court reiterated that the "contractual provisions [of the collective bargaining agreements] amply support the conclusion that the stevedores and the [shipping association] were merely conduits for monies which the carriers were obligated to pay into the longshoremen's pension fund." *Id.* at 1539. Moreover, as noted by the district court, "The mere existence of an intermediary used to collect and distribute the separate contributions of its members does not remove those members from the status of contributors to the plan." *Id.* at 1539–40 (citation omitted).

The Fund also cites the case of *Central Penna. Teamster's Pension Fund v. Ser-*

---

1. In *Uiterwyk,* Uiterwyk Corporation was a carrier who contracted with Universal Maritime Service Corporation for the loading and unloading of its vessels. Universal provided and paid longshoremen to perform the labor involved. Uiterwyk did not hire or fire the longshoremen, nor did it supervise them. Uiterwyk was, however, a signatory to the applicable collective bargaining agreement.

    Title I of ERISA defines "employer" as:
    any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.
    29 U.S.C.A. § 1002(5).

    In deciding the withdrawal liability issue, the court concluded that the definition of employer in Title I of ERISA was applicable to the MPPAA, and held that under that definition, Uiterwyk was a MPPAA employer.

2. The Second Circuit had also noted with approval the district court's observation that "to apply a common law definition of employer to the MPPAA would encourage employers to insulate themselves contractually from liability by entering into agreements under which contributions to the pension plans would be made by the entities that were not the direct employers of the plan's beneficiaries." *Korea Shipping,* 880 F.2d at 1536.

*vice Group, Inc.*, 645 F.Supp. 996 (E.D.Pa. 1985), in which Judge Huyett concluded that two companies were "employers" for MPPAA purposes: first, Service Group, which provided workers to Harley Davidson; and two, Harley Davidson, which used the workers as truckdrivers in its business. Service Group was the "employer" under the plain meaning of that term and by its collective bargaining agreements was obligated to make payments to the pension fund; it also handled negotiations with the union on behalf of Harley. Harley, on the other hand, apparently reimbursed Service Group for the wage payments and pension fund contributions made, and retained day-to-day control over the workers. In light of the goals and purposes of the MPPAA, Judge Huyett concluded the proper definition of employer for MPPAA purposes is that found in Title I of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(5), which states:

> The term employer means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

Based on that definition and the extent of control that both Service Group and Harley had over the workers, Judge Huyett concluded that both companies were MPPAA employers.

Similarly, in *American Stevedoring Corp. v. Burlington Industries*, No. 85–C–4180, 1985 WL 5057 (N.D.Ill.Dec. 19, 1985), the district court concluded that two companies were "employers" for MPPAA purposes: first, American Stevedoring Company (ASC), which "leased" workers to Burlington Industries; and two, Burlington Industries, which used the workers as truckdrivers in its business.[3] ASC was the "employer" under the plain meaning of that term and by its collective bargaining agreements was obligated to make payments to the pension fund; Burlington, on the other hand, was obligated by its contract with ASC to reimburse ASC those pension fund payments made on behalf of the leased Burlington employees.

Eagle, on the other hand, claims that it never was an employer under the MPPAA subject to withdrawal liability. In support of this contention, Eagle cites several cases[4] and attempts to distinguish those cited by the Fund as controlling. In sum, Eagle claims that because it never had an obligation under a collective bargaining agreement to contribute to the Fund on behalf of the MDS or Transpersonnel workers and because it had no control over labor relations or negotiations with those workers, it was never an "employer" for purposes of the MPPAA.

Eagle first cites the case of *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co.*, 827 F.2d 1454 (11th Cir.1987), in which the court held that nonsignatory subcontractors and sureties were not "employers" with the meaning of ERISA, 29 U.S.C. § 1132(a)(3). In that case, the union pension plan sought to recover delinquent contributions of the bankrupt general contractor. Upholding the district court, the Eleventh Circuit held that because the defendant subcontractors and sureties were not signatories to the collective bargaining agreements, they were not "employers" under the ERISA definition in 29 U.S.C. § 1002(5). As the Fund correctly notes, however, *Laborers Local 938* did not involve MPPAA withdrawal liability, and the defendant subcontractors and sureties had never made contributions to the Trust Fund.

Eagle also cites the case of *Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund*, 632 F.Supp. 630 (S.D.N.Y. 1986). In that case, the Pension Fund

---

**3.** As Judge Huyett did in *Central Penna. Teamsters,* the court adopted the definition of employer found in Title I of ERISA, 29 U.S.C. § 1002(5).

**4.** One of the cases cited by Eagle is an "unpublished" Fourth Circuit case. Because Section 36.5 of the Internal Operating Procedures of that Circuit states that citation of such opinions "is disfavored," the court finds that case to be of little precedential value and therefore will refrain from discussing it.

brought an action against Refined Sugars for withdrawal liability. To operate its fleet of trucks, Refined Sugars contracted with Francrete Corporation, an independent trucking company. Francrete directly employed the drivers, negotiated the labor agreements with Local 807, and made the contributions to the Fund. Under those circumstances, the court concluded that Refined was not an employer as that term is defined by ERISA[5] or as used under the common law, and that Refined was not a joint employer with Francrete. The court also noted that the Fund had failed to show that Refined had any meaningful control over the labor relations of Francrete.

Neither the parties' nor the court's research has uncovered a case in which the Third Circuit Court of Appeals has interpreted the meaning of the word employer as used in the MPPAA. However, after consideration of the arguments of counsel, and based on the aforementioned caselaw and consideration of the purposes of the MPPAA, *see generally Korea Shipping*, 880 F.2d at 1536–37 and *Flying Tiger Line*, 830 F.2d at 1243–44, the court finds that an appropriate definition of employer for purposes of the MPPAA is that found in Title I

of ERISA, 29 U.S.C. § 1002(5), which states:

> The term employer means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

■ The court must now determine whether based on this definition, Eagle, as successor to Clevepak, is an employer for purposes of the MPPAA. As noted above, Clevepak leased workers on a full-time basis from MDS and Transpersonnel. The workforce leased to Clevepak essentially remained stable throughout the relevant time period.[6] Although "employees" of MDS and Transpersonnel under a common law definition of the word, the leased workers' schedules, points of origin, routes, destinations, assignments, and work and safety rules were all determined by Clevepak. Plaintiff's Brief in Opposition at 5. Finally, although MDS or Transpersonnel nominally compensated the workers, Clevepak was obligated by its contracts to reimburse in full MDS and Transpersonnel for the workers' wages and any and all payments made on behalf of the workers to union pension and benefit funds.[7] Under these

---

5. The court concluded that the "employer" definition found in Title I, 29 U.S.C. § 1002(5) did not apply to MPPAA actions.

6. As noted in the Fund's brief:

> For example, the January 1975 contribution report demonstrates that the Clevepak/M.D.S. unit had six employees in January 1975; Donald Barden, John Breen, Edward Leach, Earnest Pierce, Elmer Sales, and Harry Waugh. All but Waugh recorded 20 workdays—basically a full month. (Bowman Aff. at Exhibit A, p 114). Although the workforce waxed and waned over succeeding years, it did so in accordance with seniority. In April 1981, the Clevepak/M.D.S. unit consisted of three employees, Breen, Leach, and Sales (Bowman Aff. at Exhibit A, p. 39). Furthermore, Transpersonnel did not "lease" new drivers, but continued the existing workforce. Transpersonnel's first contribution report identified four employees: Leach, Breen, Sales, and Ernest Pierce, all of whom dated back to the M.D.S. period (Bowman Aff. at Exhibit A, p. 36). Furthermore, although Ernest Pierce and Sales eventually left the unit, Breen, Sales, and (on a part time basis) Charles Pierce constituted the Clevepak unit when

Clevepak withdrew from the Fund (Bowman Aff. at Exhibit A, pp. 1–35).

Plaintiff's Brief in Opposition at 4.

7. Paragraph 7 of the Clevepak/MDS agreement specifically states the following:

> As compensation for the services provided under this Agreement, Clevepak agrees to pay M.D.S. weekly, according to the following terms:
>
> (A) Drivers wages plus a service charge of twenty-two percent (22%).
>
>     *   *   *   *   *   *
>
> (C) Full health, welfare and pension payments per man per week as required by the Teamsters Union.
>
> (D) Clevepak will recompensate M.D.S. for all paid holidays, vacations and other fringe benefits due the respective drivers according to the rates as set forth in subparagraph as above.

Plaintiff's Brief in Opposition, Exhibit A, at 3.

> Similarly, Schedule B of the Clevepak/Transpersonnel agreement states:
>
> Lessee [*i.e.,* Clevepak] will pay Lessor [*i.e.* Transpersonnel] for services rendered as follows:
>
> A) The amount of actual wages, including holiday and vacation pay, earned by Lessor's

particular facts and circumstances, and in light of the purposes of the MPPAA, *see Korea Shipping Corp. v. New York Shipping Ass'n.*, 880 F.2d 1531, 1535–37 (2d Cir.1989), the court concludes that Eagle, as successor to Clevepak, was an employer for purposes of the MPPAA. *See Central Penna. Teamster's Pension Fund v. Service Group, Inc.*, 645 F.Supp. 996 (E.D.Pa. 1985); *American Stevedoring Corp. v. Burlington Industries*, No. 85–C–4180 (N.D.Ill.Dec. 19, 1985); *see also Korea Shipping Corp. v. New York Shipping Ass'n.*, 880 F.2d 1531 (2d Cir.1989); *cf. Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund*, 632 F.Supp. 630 (S.D.N.Y.1986).

### B. *Is Eagle Obligated to Make Interim Payments of Withdrawal Liability?*

 Under the MPPAA, an employer must begin making interim payments of withdrawal liability in accordance with the plan's schedule. *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1244 (3d Cir.1987) (citing cases). Because the court has determined that Eagle was an MPPAA employer, Eagle will be directed to immediately begin making interim payments of withdrawal liability in accordance with the schedules provided by the Fund. *Id.; see also Penn Elastic Co. v. United Retail & Wholesale Employees Union, Local 115 Joint Pension Fund*, 792 F.2d 45, 47 (3d Cir.1986).

### C. *Is the Fund Entitled to Costs and Attorneys' Fees?*

Attorneys' fees are mandatory when a pension plan prevails in an action for withdrawal liability payments. *Penn Elastic Co. v. United Retail & Wholesale*

employees plus a service charge of $25.00 per week per employee.

\*     \*     \*     \*     \*     \*

C) Where applicable, Lessee also agrees to reimburse Lessor, at cost, for employees' Health, Welfare ad Pension Fund Contributions to the local Teamsters or other union representing the employees, together with any other employee benefits paid to or in behalf of such employees as a result of a union agreement obligation.

*Employees Union, Local 115 Joint Pension Fund*, 792 F.2d 45, 47–48 (3d Cir. 1986). In light of the fact that the Fund was able to settle its dispute with Transpersonnel, and in the hopes that Eagle and the Fund may now be able to settle their dispute (the court having resolved the employer status issue), the court will give the parties fifteen (15) days in which to either settle this case or notify the court whether the matter will proceed to arbitration. The court strongly encourages counsel to resolve the outstanding issues, including attorneys' fees, between themselves; however, if counsel is unable to resolve the dispute, the Fund may later move for an award of attorneys' fees.

An appropriate Order follows.

### ORDER

AND NOW, this 21st day of November, 1989, after consideration of the various memoranda submitted by the parties, it is hereby Ordered that:

1. Defendant Eagle Industries, Inc.'s motion for summary judgment (docket no. 15) is DENIED.

2. Counsel shall NOTIFY the court within fifteen (15) days of this Order regarding settlement of the case or whether the matter will proceed to arbitration.

3. At the end of the fifteen (15) day period described in paragraph 2, Eagle SHALL immediately begin making interim payments of withdrawal liability in accordance with the schedules provided by the Fund if the matter has not been settled.

AND IT IS SO ORDERED.

D) Lessee understands and recognizes that Lessor may, during the effective term of the agreement, increase employees' wages as a result of a union agreement obligation. Such increase, if any, shall be billed by Lessor and paid by Lessee in accordance with Paragraph A above.

Plaintiff's Brief in Opposition, Exhibit B.