**KOREA SHIPPING CORPORATION, Plaintiff,**

v.

**NEW YORK SHIPPING ASSOCIATION—INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION TRUST FUND and the Board of Trustees of the NYSA–ILA Pension Trust Fund, Defendants.**

No. 86 Civ. 3428 (EW).

United States District Court, S.D. New York.

June 25, 1987.

Healy & Baillie, New York City (John D. Kimball, Leroy Lambert and Nancy Diamond, of counsel), for plaintiff.

Lambos, Flynn, Nyland & Giardino (C.P. Lambros, Donato Caruso and Nicholas G. Maglaras, of counsel), and Thomas W. Gleason (Ernest L. Mathews, Jr. and Susan G. Barres, of counsel), New York City, for defendants.

## OPINION

EDWARD WEINFELD, District Judge.

Defendants, the New York Shipping Association-International Longshoremen's Association Pension Trust Fund ("Pension Trust Fund") and The Board of Trustees of the NYSA–ILA Pension Trust Fund, move for summary judgment to dismiss plaintiff's claim for declaratory judgment that it is not an employer subject to pension withdrawal liability under the Multiemployer Pension Plan Amendments Act[1] ("MPPAA" or "the Act"), and for judgment on their counterclaim for the amount of Korea Shipping Corporation's ("KSC")

---

1. 29 U.S.C. § 1381, et seq.

alleged withdrawal liability. KSC cross moves for summary judgment on the issue of whether it is an employer under the terms of the MPPAA. KSC also argues that the Act is partially unconstitutional even if the Court finds that it applies to KSC, and that even if the Act is deemed constitutional, KSC has not waived its right to arbitration pursuant to 29 U.S.C. § 1401.

KSC is a Korean corporation that operates as an ocean carrier of a wide range of cargoes which it transports to and from ports in the Far East. KSC operates in the bulk cargo trades for commodities such as grain, timber and coal; operates general cargo vessels; and it operates a number of container vessels. From 1967–1985 KSC's ships called at the Greater New York harbor where KSC engaged stevedoring companies to load or discharge its cargo. The stevedores hired longshoremen to carry out this task. Since 1976, loading and unloading of KSC's vessels were carried out under the terms of an agreement referred to as the General Cargo Agreement. The signatories to this Agreement were the ILA, the NYSA, and the members of the NYSA, through subscription.

On April 26, 1985, after KSC had discontinued operations in New York, the Pension Trust Fund assessed withdrawal liability pursuant to the MPPAA according to what is termed the "one pool" method of calculation. The Pension Trust Fund presented KSC with a schedule of periodic installments to be paid by KSC, and KSC made a request for reconsideration on July 19, 1985, which gave it 180 days (to January 15, 1986) to request arbitration before its right to arbitration was waived. On July 19, 1985, the Pension Trust Fund and KSC extended KSC's deadline "to commence any and all proceedings which may be available to KSC under the governing statutes and regulations," to March 31, 1986. In a letter dated March 28, 1986 the Pension Trust

Fund and KSC entered into an agreement which provided that KSC would make payment on or before April 24, 1986 of four outstanding periodic installments and the Pension Trust Fund would forebear instituting an action to enforce its withdrawal liability claim and would presume the status quo in effect on September 18, 1985. KSC failed to make the payments and has not requested arbitration. KSC filed this action on April 30, 1986.[2]

Despite the massive papers and briefs submitted on this motion and cross motion for summary judgment, it appears that the parties agree that the issue of whether KSC is an "employer," and thus subject to withdrawal liability under the Act, is ripe for disposition under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff concedes that the only material dispute between the parties concerns the ultimate legal issue of its employer status, rather than the factual contours.

Essentially KSC's position, however variously stated, is that its only obligation was to pay tonnage and man hour assessments which, though intended for the direct employer, that is the stevedoring companies, were sent directly to the NYSA as a matter of convenience. In sum, KSC urges that while it was obligated to pay tonnage and man hour assessments, that obligation ran to the stevedores, who in turn were obligated to the NYSA, who then remitted the allocable sums to the Pension Trust Fund. However, this contention distorts the language of the General Cargo Agreement and omits a number of other factors which bear on the issue of employer status—the principal factor being the MPPAA. It is preliminarily noted that the issue of employer status is not governed by whether or not KSC was the common law employer of the longshoremen; it was not. Resolution of this issue is governed by the provi-

2. On August 21, 1986 this Court ordered that pending final disposition of plaintiff's claim that it is not an "employer" under the MPPAA, the plaintiff was directed to bring its periodic payments of withdrawal liability current, and to make such additional payments as arose when due. Subsequent to this order the Court orally ordered that the withdrawal liability payments be made into an escrow account. These orders were appealed and both appeals were dismissed. 811 F.2d 124. It is now estimated that the escrow fund contains in excess of six million dollars.

768 of the MPPAA, and thus we turn to this Act and its history.

In 1974 Congress enacted the Employee Retirement Income Security Act ("ERISA")[3] in order to "provide comprehensive regulation for private pension plans."[4] ERISA was designed to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.[5] Subsequent to the enactment of ERISA, Congress became concerned " 'that ERISA did not adequately protect multiemployer plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans.' "[6] Specifically, Congress was concerned about the threat to the solvency and stability of multiemployer plans caused by employer withdrawals.[7] In response to this concern, Congress enacted the MPPAA.[8]

The MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."[9] The threshold issue in this case is whether, based upon the facts, KSC falls within the meaning of "employer" under this section and is thus subject to withdrawal liability. The MPPAA contains no definition of the term "employer," and the legislative history contains no direct references to Congress' intent in its use of this term. Thus, the determination of how to apply the term "employer" must be arrived at by assessing the history, terms and purposes of the legislation.[10]

There is no evidence that in using the term "employer" Congress intended it to be a term of art with a definite meaning. Its meaning must be derived from the context of the statute, assessed in the light of the statute's remedial objectives and purposes.[11] Our Court of Appeals has noted that, "the surest way to misinterpret a statute is to follow its literal language without reference to its purpose,"[12] and the Supreme Court has repeatedly warned against "the dangers of an approach to statutory construction which confines itself to the bare words of a statute ... for 'literalness may strangle meaning.' "[13] Perhaps the now classic words of Judge Learned Hand provide the best guide to a court in construing the language of a statute:

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.[14]

The House Report to the MPPAA states that "[t]he basic policy of the Act is that the retirement income security of multiemployer plan participants is best assured by fostering the growth and continuance of multiemployer plans. ... A primary objective of the legislation is to insulate plans to the extent possible from declines, through

---

3. 29 U.S.C. § 1001 et seq.

4. *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 1020, 89 L.Ed.2d 166 (1986).

5. *Id.*

6. *Id.* 106 S.Ct. at 1021 (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)).

7. *Id.* 106 S.Ct. at 1021–22.

8. *Id.* at 1022.

9. 29 U.S.C. § 1381(a).

10. *NLRB v. Hearst Publications,* 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944).

11. *Id.*

12. *Viacom Int'l, Inc. v. FCC.,* 672 F.2d 1034, 1040 (2d Cir.1982).

13. *Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (quoting *Utah Junk Co. v. Porter,* 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946)).

14. *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

sounder funding, employer withdrawal liability, and plan reorganization...." [15] This demonstrates that the Congress' primary objective in enacting the MPPAA was to protect the multiemployer plan participants from financial instability in relation to funding of the Plan.[16] In fact this was such an overriding objective that the MPPAA contains no provision for excusing a contributor from withdrawal liability if its particular withdrawal from a plan will not in fact harm the plan. This objective supports a broad reading of the term "employer," as used in reference to withdrawal liability, in order to insure the financial stability of the multiemployer plans.

While the definition of "employer" contained in Title I of ERISA is not directly applicable to the definition of "employer" under the MPPAA,[17] the Supreme Court has held that the definitions in Title I "may otherwise reflect the meaning of the terms defined as used in other Titles." [18] Title I of ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan...." [19] In the context of the history, terms and purposes of the MPPAA, particulary in the light of the Congressional objective to preserve the financial integrity of multiemployer pension plans through the imposition of withdrawal liability, it is appropriate to conclude that the Title I definition of "employer" sheds some light on the scope of that term as used in section 1381 of the MPPAA.

To allow a party who is contractually obligated to contribute to a multiemployer plan, and is dependent on the services of the participants of that plan in carrying out its business, to escape withdrawal liability would frustrate the clear Congressional in-

tent behind requiring the payment of withdrawal liability. The risk which Congress sought to address through the MPPAA was to preserve the fiscal soundness of a multiemployer plan from being impaired by the withdrawal of a contributor to that plan before the contributor had satisfied its portion of the plan's unfunded vested benefits.[20] Clearly, through the imposition of liability in the event of withdrawal, Congress sought to remove the incentive for a contributor to withdraw prematurely from a plan, and, where such withdrawals took place, to mitigate the financial impact on the plan through the actual payment of withdrawal liability. To give the term "employer" a common law or dictionary definition, rather than the more practical meaning applied to the term "employer" in Title I of ERISA, would eliminate withdrawal liability for a large number of "contributors" and expose many multiemployer plans to the precise threat that Congress meant to address through the enactment of the MPPAA. Plaintiff argues that it is not an "employer" under the Act because it does not fall within the common law meaning of the term. However, we are not dealing with the common law here, but rather a statute whose provisions must be interpreted in the light of its history and objectives. Absent such a definition of the term "employer" in the Act, application of the common law definition of "employer" to the MPPAA withdrawal liability provision is inappropriate in the light of that Act's history and the purpose behind its enactment.

Permitting a person, who was contractually obligated to contribute to a plan in the indirect interests of an employer (in this case the stevedores) to escape withdrawal liability would create such a significant exception to the statutory framework that

**15.** 1980 U.S.Code Cong. & Admin.News, pp. 2918, 2933.

**16.** *See Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 1021–22, 89 L.Ed.2d 166 (1986).

**17.** *See Nachman v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 370, 100 S.Ct. 1723, 1730, 64 L.Ed.2d 354 (1980). *See also Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund,* 632 F.Supp. 630, 632 (S.D.N.Y.1986).

**18.** *Nachman v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 370 n. 14, 100 S.Ct. 1723, 1731 n. 14, 64 L.Ed.2d 354 (1980).

**19.** 29 U.S.C. § 1002(5).

**20.** *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 1022, 89 L.Ed.2d 166 (1986).

the very effectiveness of the Act would be threatened. The application of a technical construction to the meaning of "employer" would allow for a situation in which those with the obligation to contribute to a plan might not be considered employers under the Act, and thus not subject to withdrawal liability, while the actual or direct "employers," because they would not themselves be contributors to the plan, would also not be subject to withdrawal liability. This situation would leave a plan completely unprotected from the consequences of the withdrawal of contributions before completion of the plan's unfunded vested benefits. To read the statute in this restrictive manner would encourage employers to insulate themselves from withdrawal liability by structuring relationships in which contributions to multiemployer plans were made by persons who were not the direct employers of the plan's participants. This would afford a convenient "escape hatch" from liability for both the employer and nonemployer by allowing the nonemployer to discharge the debts it incurs, for ongoing services provided to it by the direct employer, by making payments to a pension plan established for the direct employer's employees. Were the contributing nonemployer's relationship with the direct employer terminated, it could withdraw as a contributor to the plan without fear of withdrawal liability since the Act would not be applicable to it. Nor would the Act be applicable to the actual employer since it imposes withdrawal liability only on "an employer [who] withdraws from a multiemployer plan,"[21] and withdrawal is defined as the cessation of the obligation to contribute under the plan or the cessation of covered operations under the plan.[22]

Thus this Court finds that the term "employer," as used in 29 U.S.C. § 1381(a), is meant to include a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.[23] The fact that the House Ways and Means Committee failed to adopt a proposed definition of employer which would have included any ship owner, operator, or other person whose ships carry cargo subject to assessments to be paid to a pension plan[24] does not give rise to an inference that it rejected such a definition since Congreee chose to provide no definition whatsoever of the term "employer" in the MPPAA.[25]

The next issue to be addressed is whether or not KSC's relationship to the NYSA–ILA Pension Trust Fund falls within the above construction of the term employer as used in 29 U.S.C. § 1381(a). During the period in question, the International Longshoremen's Association ("ILA"), representing the rank and file longshoremen, negotiated what are called "master contracts" with a combined management group composed of the New York Shipping Association ("NYSA") and its counterpart associations in ports from Maine to Texas. These contracts fix the master terms of employment which apply uniformly in every port in which the ILA functions. They set wages, hours, contract terms, pension contributions, welfare contributions, containerization agreements, and the terms of the Job Security Program. After reaching agreement on these matters through the master contract, the NYSA, which is composed of steamship carriers (including KSC), stevedores and other employers of longshoremen labor in the Port of New York, then bargains with the local ILA over the local terms and conditions of employment, including such matters as seniority, hiring practices, safety, vacation, holidays, and pension and welfare benefits. These local agreements are embodied in what is called the General Cargo Agreement.

---

21. *29 U.S.C. § 1381(a).*

22. *29 U.S.C. § 1383(a).*

23. *Accord In re Uiterwyk Corp.,* 63 B.R. 264 (M.D.Fla.1986).

24. *See In re Seatrain Lines, Inc.,* 46 B.R. 320, 322 (S.D.N.Y.1985) (quoting The Multiemployer Pension Plan Amendments Act of 1979: Hearing on H.R. 3904 Before the House Comm. on Ways and Means, 96th Cong. 2d Sess. 92 (1980)).

25. *But see In re Seatrain Lines, Inc.,* 46 B.R. 320 (S.D.N.Y.1985).

It is undisputed that during the period in which KSC loaded or discharged cargo in the Port of Greater New York that it was a member of the NYSA, which, as previously mentioned, is one of the employer associations which negotiated and signed master contracts with the ILA. KSC also directly executed the master contracts that were negotiated on its behalf, and on behalf of other carriers, by the NYSA and other employer associations in 1977, 1980 and 1984. In addition, KSC directly subscribed to certain local agreements negotiated between the NYSA and the local ILA, which included specific provisions concerning the payment of wages, contributions to welfare plans, and contributions to pension plans. As previously mentioned, one of these local agreements subscribed to by KSC is called the General Cargo Agreement.

The General Cargo Agreement provides that:

> In order to meet obligations arising under collective bargaining agreements between New York Shipping Association, Inc. ("NYSA") and International Longshoremen's Association, AFL–CIO ("ILA") for pension, welfare and clinics, guaranteed annual income ("GAI"), vacations, holidays, and the minimum guarantees for pensions, welfare, and clinics, supplemental cash benefits, as well as administrative support of NYSA (as determined by it) the following tonnage and man-hour assessment method for the three year period ending September 30, 1983 is hereby agreed to as an integral part of the collective bargaining agreement between the parties hereto. . . .

The agreement further provides that "[e]ach carrier (both private and governmental) shall be responsible for an assessment amount per ton on each ton of non-excepted cargo loaded or discharged in the Port of New York . . ." and that:

> Such tonnage assessment shall be collected by the direct employer from each of the carriers and shall be paid to NYSA for immediate transmittal to the NYSA–ILA Fringe Benefits Escrow Fund (after deduction of pension payments an [sic] NYSA administrative expenses) as collected by said direct employers. Pension payment shall be made by NYSA directly to the NYSA–ILA Pension Trust Fund. Amounts billed to carriers and not collected by the direct employers shall be reported to the NYSA–ILA Fringe Benefits Escrow Fund promptly at the end of each billing period.

■ The fact that it is the NYSA that physically made the contributions to the Pension Trust Fund is irrelevant. It received these funds from KSC and other carriers under the terms of the General Cargo Agreement to which, as noted, KSC was a party both as a member of the NYSA and as a signatory. The function of the NYSA is to represent its members in the process of engaging in the collective bargaining of these members' labor relationships with the ILA. As part of this process, the members of the NYSA use it as a conduit in directly funding the NYSA–ILA Pension Trust Fund. To hold that it is the NYSA that is obligated to make contributions to the Pension Trust Fund but not its members would be to put form over substance and thereby create another convenient method for insulating persons contributing to a multiemployer plan from withdrawal liability. The mere existence of an intermediary used to collect and distribute the separate contributions of its members does not remove those members from the status of contributors to the plan. It is not the method of collection and payment to the Pension Trust Fund that is at issue here, but rather the critical issue is whether KSC was acting directly as an employer or indirectly in the interests of an employer, in this case the stevedores, with respect to the pension plan. The fact is that the affidavit of Ho-Young Lee, a Vice President of KSC, concedes that "[f]rom notices received from NYSA, KSC was, of course, aware of the tonnage assessments and knew that some part of those monies was used to fund an ILA pension fund." Moreover, it is uncontested that after collecting the tonnage assessments, the NYSA made direct pension payments to the Pension Trust Fund.

It is beyond dispute that KSC contractually obligated itself to contribute funds

which were to be used, at least in part, to fund directly a multiemployer pension plan. Those funds were actually transferred to the plan on its behalf by the NYSA. The General Cargo Agreement, to which KSC subscribed, specifically provides that in order to meet obligations arising under the collective bargaining agreements between the NYSA and the ILA, including the pension plan, the carriers were required to pay certain tonnage assessments, and that this obligation was incorporated as an integral part of the collective bargaining agreement between the parties. The General Cargo Agreement also specifically provides that it is "made and entered into by and between *the members* ... of the New York Shipping Association, Inc ... and the International Longshoremen's Association...." (emphasis added) and further states that the Agreement will be executed by the NYSA "for and on behalf of" its members *and* by each contracting stevedore and vessel carrier who directly or indirectly utilizes the services of any employees covered by the Agreement and who by such execution binds itself and its successors to each and every term and condition of the Agreement, "including, without limitation, the contribution of its proportionate share of the hourly and tonnage contributions provided herein...." To allow KSC to shield itself behind a particular method used to collect and fund the pension plan, without regard to the nature of the obligation itself, would be to allow individuals to freely circumvent the MPPAA. KSC's assertion that it was the NYSA that had an obligation to contribute, or alternatively the stevedores who were the direct employers of the longshoremen [26], and that the carriers had no such obligation, ignores the reality of the situation.[27] KSC obligated itself to pay assessments which it knew were intended and used to meet its responsibility, as a member of the NYSA and a subscriber to the General Cargo Agreement, to fund the pension plan.

■ The facts of this particular case make the application of withdrawal liability to KSC especially appropriate in that not only was KSC obligated to contribute to the plan through tonnage assessments, but it also utilized the services of the participants of the plan extensively. In fact, the special employment relationship between the carriers and the longshoremen has been recognized in litigation concerning the Rules on Containers.[28] Further, the agreements between the members of the NYSA and the ILA, to which KSC was a party, appear to have assumed that there was at least an indirect employment relationship between the carriers and the longshoremen, and those agreements were negotiated, and payments were to be made, on behalf of the carriers *and* the stevedores, who are the direct employers of the longshoremen. KSC's vessels could not have been loaded or unloaded in New York harbor without compliance with the agreements to which it was a party. Under all the circumstances, KSC fits within the meaning of the term "employer" as it is used in 29 U.S.C. § 1383(a) because unquestionably it was, at the very least, acting indirectly in the interests of an employer in relation to the pension plan, and therefore it is subject to withdrawal liability. Defendants' motion for summary judgment on the question of whether KSC is an employer subject to withdrawal liability under

---

26. In fact the General Cargo Agreement only provides that a stevedore would be responsible for tonnage assessments if it performs work for a carrier who is not a party to the collective bargaining agreement. The stevedores only other function with reference to the assessments was to physically *collect* them for transference to the NYSA, and, in practice, most stevedores did not even perform this function.

27. While the NYSA itself also falls within the definition of "employer" contained in Title I since it is a "group or association of employers acting for an employer in such capacity," 29

U.S.C. § 1002(5), there is no reason to assume that because it can be subject to withdrawal liability, KSC is excluded from such liability. The agreements to which KSC is a direct signatory demonstrate otherwise.

28. *See, e.g., International Longshoremen Ass'n, AFL–CIO v. NLRB,* 613 F.2d 890, 912 (D.C.Cir. 1979), *aff'd,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980); *International Longshoremen's Ass'n, AFL–CIO v. NLRB,* 537 F.2d 706 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977).

the MPPAA is granted and KSC's cross motion is denied.

### Presumption of Correctness

In its fourth cause of action KSC challenges the constitutionality of the presumption of correctness afforded by 29 U.S.C. § 1401(a)(3)(A) to a plan's initial determination of an employer's withdrawal liability. Our Court of Appeals has previously held that this provision does not violate the due process rights of an individual who is subject to withdrawal liability.[29] Thus summary judgment is granted in favor of the defendants' on this issue, dismissing this cause of action.

### Discovery

Pending consideration of the threshold issue of KSC's status as an employer under the MPPAA, the Court limited all discovery to this basic issue. Plaintiff has not yet had the opportunity to engage in discovery relating to its second, third, fifth and sixth causes of action, nor has there been discovery on the waiver of arbitration issue. Before considering the defendants' motion for summary judgment on these issues it is desirable to have a full record established, and therefore the defendants' motion for summary judgment on these causes of action is denied with leave to renew on completion of discovery.

### Conclusion

Defendants' motion for summary judgment is granted on the issue of plaintiff's status as an employer under the MPPAA and on the issue of the constitutionality of the presumption of correctness of a multiemployer plan's initial determination of withdrawal liability. It is denied as to all other claims without prejudice to renewal upon completion of pretrial discovery. Plaintiff's cross motion for summary judgment on the issue of its status as an employer under the MPPAA is denied, and its motion with regard to whether it has waived its right to arbitration of the existence and amount of its alleged withdrawal liability is denied without prejudice to re-newal upon the completion of pretrial discovery.

So Ordered.

---

**29.** *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 854 (2d Cir.1984).