920 F.2d 503
 13 Employee Benefits Ca 1205
 SEAWAY PORT AUTHORITY OF DULUTH, Appellee,
v.
DULUTH-SUPERIOR ILA MARINE ASSOCIATION RESTATED PENSION
PLAN; and The Board of Trustees of the
Duluth-Superior ILA Marine Association
Restated Pension Plan, Appellants.
 No. 89-5601MN.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1990.
Decided Nov. 30, 1990.
 
 Kenneth D. Butler, Duluth, Minn., for appellants.
 Robert C. Maki, Duluth, Minn., for appellee.
 Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 In this declaratory judgment action, the Duluth-Superior ILA Marine Association Restated Pension Plan and its trustees (the Trustees) appeal from the district court's[1] order granting the Seaway Port Authority of Duluth's (SPAD) motion for summary judgment on the ground that SPAD was not an "employer" on or before May 28, 1987, for the purposes of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1001-1461, and its amendment, the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96-364, 94 Stat. 1208 (1980). The Trustees argue on appeal that the district court erred in applying state law to determine whether SPAD was an employer under the federal statutes and also in determining that SPAD was not an employer under the federal statutes. Because the Authority was not an employer under the federal statutes, we need not decide the state law issue and thus affirm the district court's order.
 
 I.
 
 2
 The Duluth-Superior ILA Marine Association Restated Pension Plan is a multiemployer pension plan. The Seaway Port Authority of Duluth is a public entity organized under Minn.Stat.Ann. Secs. 469.048-469.107 (Supp.1990). SPAD owns and operates the Arthur M. Clure Public Marine Terminal in Duluth, Minnesota. From 1977 until May 28, 1987, SPAD contracted with North Central Terminal Operators, Inc. to manage the terminal. Article I of the contracts[2] between SPAD and North Central provided that North Central would act as SPAD's managing agent for all terminal operations, including stevedoring, securing, cleaning, fitting, and berthing services. Article II of the contracts provided that North Central would be the employer of all operating personnel and that North Central would sign any collective bargaining agreements. Article III of the contracts provided that all funds needed for or arising from the terminal's operation would be deposited in accounts designated by SPAD. Article III further provided that North Central would maintain a separate payroll account into which SPAD would deposit funds from the operating account to enable North Central to meet its payroll and fringe benefit expenses. The checks for pension fund contributions were signed by both SPAD and North Central personnel.
 
 
 3
 On May 29, 1987, North Central ended its relationship with SPAD. Pursuant to ERISA Sec. 4219, 29 U.S.C. Sec. 1399(a), North Central completed a Statement of Business Affairs, supplying information about North Central's cessation of contributions to the pension plan. In the report, North Central contended that it never had an obligation to contribute to the pension plan, and thus denied any withdrawal liability.
 
 
 4
 On July 1, 1988, the Trustees notified SPAD that they believed North Central's termination constituted a complete withdrawal from the pension plan and that SPAD had incurred withdrawal liability under 29 U.S.C. Sec. 1381. Section 4201 of ERISA, 29 U.S.C. Sec. 1381, states in pertinent part: "(a) If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." SPAD maintained that it was not an employer under the statute, that North Central was, and that SPAD thus was not liable for the withdrawal payments. SPAD and the Trustees agreed that SPAD would seek declaratory relief in federal district court to determine whether SPAD was an employer for the purposes of ERISA withdrawal.
 
 
 5
 SPAD filed its complaint for declaratory relief on October 6, 1988, and asked the court to determine whether it was an employer under ERISA, common law, or the MPPAA. The Trustees counterclaimed for a determination that SPAD was an employer under the federal statutes and the common law. Both parties then moved for summary judgment. The district court granted SPAD's motion for summary judgment and held that SPAD was not an employer under ERISA or the MPPAA on or before May 28, 1987, the date of North Central's termination. The Trustees now appeal this ruling.
 
 II.
 
 6
 This is a matter of first impression in this circuit. Before discussing the parties' arguments, we will briefly describe the statutory scheme involved. Congress enacted ERISA in 1974 to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). To achieve this, Congress created the Pension Benefit Guaranty Corporation (PBGC), which insures certain pension plans and provides benefits to underfunded plans upon termination. Id. After several years, the PBGC determined that ERISA did not sufficiently insulate plans from the adverse effects caused by the withdrawal of one employer from a multiemployer plan. Id. at 722, 104 S.Ct. at 2714. Responding to this concern, Congress amended Title IV of ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96-364, 94 Stat. 1208 (1980). As one court has described the statute:
 
 
 7
 The [MPPAA] added subtitle E to Title IV of ERISA. The MPPAA establishes withdrawal liability for employers that cease participation in a multiemployer pension plan, as well as means for computing that liability. Complete withdrawal from a multiemployer pension plan occurs when an employer either permanently ceases to have an obligation to contribute under the plan or permanently ceases all operations covered under the plan.... At the time that an employer withdraws from a plan, the plan is required by the MPPAA to determine the amount of the employer's withdrawal liability, and notify the employer of that amount.
 
 
 8
 Connors v. B.M.C. Coal Co., 634 F.Supp. 74, 75 (D.D.C.1986) (citations omitted). In this case, the Trustees have determined that SPAD's alleged withdrawal liability is approximately $200,000.
 
 
 9
 The Trustees argue on appeal that the district court erred in holding that SPAD was not an employer for the purposes of ERISA and the MPPAA. They first argue that the district court improperly applied state common law in determining that SPAD was not an employer. It is impossible, however, to discern from the record what exactly were the grounds on which the district court based its decision. At the summary judgment hearing, the district court remarked that to determine whether SPAD was an employer, it had to look to the Minnesota statute that established SPAD and to the existing law about the control of funds and employees. But the district court also addressed the Trustees' federal law arguments. In its subsequent order granting SPAD's summary judgment motion, the district court cited no authority and gave no reasons for its decision, but simply concluded that SPAD was not an employer under ERISA and the MPPAA. Regardless of the actual grounds on which the district court based its decision,[3] we review the Trustees' arguments de novo because the definition of employer under the MPPAA is a question of law. Cf. Short v. Central States, S.E. & S.W. Areas Pension Fund, 729 F.2d 567, 571 (8th Cir.1984) (stating that definition of employee under ERISA is a question of law).
 
 
 10
 The Trustees contend that the proper standard for determining whether SPAD is an employer is the definition found in ERISA: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." ERISA Sec. 3(5), 29 U.S.C. Sec. 1002(5). SPAD responds, correctly, that although ERISA defines an employer, the MPPAA does not. ERISA's definition of employer is contained in Title I of the statute. The withdrawal liability provision, however, is contained in Title IV of ERISA. This distinction is important because Title I's definitional section begins with the statement, "For purposes of this title:...." ERISA Sec. 3, 29 U.S.C. Sec. 1002 (emphasis added). As the Supreme Court noted in Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), terms defined in Title I of ERISA "are not necessarily applicable to Title IV, because they are limited by the introductory phrase, 'For purposes of this title,' " id. at 370, 100 S.Ct. at 1731, and "Title I definitions do not apply elsewhere in the Act of their own force." Id. at 370 n. 14, 100 S.Ct. at 1731 n. 14.
 
 
 11
 The Trustees reason that ERISA's broad definition nevertheless applies because it best effectuates the purpose of ERISA, which is to provide the maximum degree of protection to employees covered by private retirement plans. The Trustees do not draw this conclusion in a vacuum; several district courts have held that the ERISA definition of employer applies to the MPPAA. See In re Uiterwyk Corp., 63 B.R. 264, 266 (M.D.Fla.1986); Central Pa. Teamster's Pension Fund v. Service Group, Inc., 645 F.Supp. 996, 997 (E.D.Pa.1985); American Stevedoring Corp. v. Burlington Indus., Inc., No. 85-4180, 1985 WL 5057 (N.D.Ill. Dec. 19, 1985) (LEXIS, Genfed library, Dist file). More persuasive authority, however, holds otherwise. See Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund, 880 F.2d 1531, 1537 (2d Cir.1989); DeBreceni v. Graf Bros. Leasing, Inc., 828 F.2d 877, 879-80 (1st Cir.1987), cert. denied sub nom. New England Teamsters & Trucking Indus. Pension Fund v. Graf, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988); Glover v. S.D.R. Cartage Co., Inc., 681 F.Supp. 1293, 1295 (N.D.Ill.1988); Connors v. B.M.C. Coal Co., 634 F.Supp. 74, 76 (D.D.C.1986); Connors v. Darryll Waggle Constr., Inc., 631 F.Supp. 1188, 1191 (D.D.C.1986); Combs v. Sun-Up Co., Inc., 634 F.Supp. 13, 15 (D.D.C.1985).
 
 
 12
 In DeBreceni, the First Circuit rejected the same argument the Trustees ask us to accept, namely, that the Title I definition of employer applies to the MPPAA. The First Circuit reasoned that because the Title I definition is expressly limited to Title I, defining employer under Title IV is up to the courts. DeBreceni, 828 F.2d at 879-80. The circuit court then examined the MPPAA's purposes and policy considerations to determine that controlling shareholders and officers were not employers under the statute. Id. at 880-81. The Second Circuit has also taken the position that because Title I definitions do not necessarily apply to Title IV, courts must define employer for the purposes of the MPPAA.[4] Korea Shipping, 880 F.2d at 1532. The District of Columbia Circuit has implicitly agreed. In Connors v. P & M Coal Co., 801 F.2d 1373 (D.C.Cir.1986), the circuit court, without deciding the general applicability of Title I definitions to Title IV, determined that controlling shareholders were not employers under the MPPAA, id. at 1377, implying that it believes courts should decide who is an employer. We agree with our sister circuits and conclude that ERISA Sec. 3(5), 29 U.S.C. Sec. 1002(5), is not applicable to withdrawal liability under the MPPAA, and that the definition of employer under the MPPAA is for the courts to decide.
 
 
 13
 We next must determine the proper definition of an employer for the purposes of the MPPAA. We believe the purposes and policies underlying the MPPAA are best satisfied by the definition the Second Circuit proffered in Korea Shipping: "[T]he term employer in 29 U.S.C. Sec. 1381(a) means 'a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.' " Korea Shipping, 880 F.2d at 1537 (quoting district court's opinion in the same case, 663 F.Supp. 766, 770 (S.D.N.Y.1987)); accord Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 261 (2d Cir.1990). The Eleventh Circuit has also adopted this definition. See Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n, AFL-CIO Pension Plan & Trust, 896 F.2d 1330, 1343 (11th Cir.1990).
 
 
 14
 Although we now have a definition of employer, we still must determine what that definition means in this case. There is a paucity of case law applying this definition; what case law there is, however, supports SPAD's contention that it is not an employer under the MPPAA. The Second Circuit's analysis in the various cases makes clear that the appropriate inquiry is whether the alleged employer had an obligation to contribute and what was the nature of that obligation. In Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund, 880 F.2d 1531 (2d Cir.1989), the alleged employers contended that they were not subject to withdrawal liability because under their collective bargaining agreements they had no direct obligation to make pension contributions. Id. at 1539. They had, however, signed a General Cargo Agreement (GCA) that obligated them to pay tonnage assessments to the New York Shipping Association (NYSA), which in turn used part of those fees to make pension plan contributions. The alleged employers argued that the fees were not "obliged contributions" to the pension plan, and that it was the NYSA that was obligated to contribute. The Second Circuit disagreed, responding: "The fact that the NYSA was the party that transferred the monies to the Fund is irrelevant." Id. The court pointed out that the GCA explicitly stated that the employers were responsible for the fees that the direct employers would collect and pay to the NYSA. Id. The GCA also explicitly stated that the NYSA would then make direct contributions to the pension plan. Id. The Second Circuit concluded: "These contractual provisions amply support the conclusion that the [direct employers] and the NYSA were merely conduits for monies which the carriers were obligated to pay into the longshoremen's pension fund." Id. (emphasis added).
 
 
 15
 In Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258 (2d Cir.1990), the Second Circuit dealt with an issue arising from its Korea Shipping decision, namely, whether an alleged employer who has not signed the GCA is still subject to withdrawal liability. The alleged employer in Bowers was a member of the NYSA and had paid the required tonnage assessments, but had never signed the GCA. The Bowers court noted that if the employer had actually signed the GCA, its liability would be indisputable. Id. at 262. But the fact that the employer had not signed the GCA did not preclude a finding of withdrawal liability because the NYSA, of which the employer was a member, had signed the GCA. Id. The NYSA's by-laws provided that all members would be bound by such an agreement unless they objected in writing, which the alleged employer had not done. Id. The alleged employer contended that the by-laws did not bind it because it had never expressly ratified them. The Second Circuit rejected this argument, stating that the employer had ratified the NYSA by-laws by paying the tonnage assessments and signing the NYSA's membership application. Id. The only way the employer could have avoided its obligations under the NYSA, the Second Circuit concluded, was by repudiating the GCA and the NYSA memberships, which it failed to do. Id.
 
 
 16
 Most recently, the Second Circuit held an alleged employer subject to withdrawal liability where it contractually agreed to pay tonnage assessments to the NYSA and had signed a separate agreement in which it subscribed to the collective bargaining agreement between the NYSA and the longshoremen's union. Philippines, Micronesia & Orient Navigation Co. v. NYSA-ILA Pension Trust Fund, 909 F.2d 39, 41 (2d Cir.1990) (per curiam), petition for cert. filed, 59 U.S.L.W. 3352-53 (U.S. Oct. 3, 1990) (No. 90-576).
 
 
 17
 One other circuit has adopted the Second Circuit's withdrawal liability analysis. Relying heavily on the Second Circuit's Korea Shipping decision, the Eleventh Circuit in Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n, AFL-CIO Pension Plan & Trust, 896 F.2d 1330 (11th Cir.1990), held that an entity was subject to withdrawal liability because, on the basis of its contractual obligations, it was an employer under the MPPAA. Id. at 1344. The entity in that case, the Carriers Container Council (CCC), was an association of shipping companies that signed contracts with various unions to set up a Job Security Program (JSP). The JSP was the result of an earlier labor dispute about declining pension contributions due to the modernization of the shipping industry. The JSP agreements provided that the individual carriers would pay a tonnage assessment that the CCC would hold in a fund and use to cover shortfalls in pension contributions. The Eleventh Circuit emphasized the similarity between the JSP agreement, which stated that the CCC must collect tonnage assessments, place them in an account, and then pay out funds as needed to cover pension plan shortfalls, and the GCA in Korea Shipping, concluding that "CCC is clearly a contributing obligor." Id. CCC argued that because it had not signed all of the union contracts, it had no obligation to contribute. The Eleventh Circuit disagreed, finding that the JSP agreement and the various union contracts were "interrelated collective bargaining agreements." Id. The court also noted that even if CCC was not a direct party to some of the coal union contracts, it still was obligated under the JSP agreement. Id.
 
 
 18
 Before the Second Circuit's decision in Korea Shipping, the Ninth Circuit had addressed the issue of the proper definition of employer under the MPPAA in H.C. Elliot, Inc. v. Carpenters Pension Trust Fund, 859 F.2d 808 (9th Cir.1988), a case neither party cites. In H.C. Elliot, the employer argued that it was not subject to withdrawal liability under the MPPAA because it was not a direct employer, but rather subcontracted its work. Id. at 812. The Ninth Circuit found this distinction specious, noting that the withdrawal statute did not require direct employment. Id. at 813. The circuit court then stated: "The word 'employer' describes one who [is] a signatory employer with respect to the [pension] plan." Id. (emphasis added). Because the employer's subcontractors continued to perform work covered by the collective bargaining agreement the employer had signed, it was subject to withdrawal liability. Id.
 
 
 19
 This review of the relevant case law reveals one fact common to all of the parties held subject to withdrawal liability: they were contractually bound to make pension contributions, either in collective bargaining agreements, general cargo agreements, or shipping association agreements. Cf. also Laborers Local 938 v. B.R. Starnes Co., 827 F.2d 1454, 1456-57 (11th Cir.1987) (per curiam) (holding that ERISA's definition of employer does not include persons other than signatory employers). In this case, it is undisputed that SPAD did not sign any collective bargaining agreements. Nor did it sign a shipping association agreement. Nor did SPAD sign the pension plan's trust agreement that established the contribution duty during the relevant period. Our review of the record does not reveal any contracts SPAD signed explicitly obligating it to make pension contributions.[5] Thus, applying the relevant case law, SPAD is not obligated to contribute and is not an employer under the MPPAA.
 
 
 20
 Further supporting our decision is the nature of SPAD itself. As mentioned previously, SPAD, unlike any of the employers in the case law, is a creature of state law. One of the statutory provisions governing SPAD is Minn.Stat.Ann. Sec. 469.055(11) (Supp.1990), which delimits SPAD's contractual powers with regard to managing agents. Those powers include the ability to specify that "employees engaged by the agent are employees of the agent and not of the port authority," and that "the agent is responsible to pay the employees and to comply with ... federal laws affecting the employees." Id. Article II of the various Managing Agent Agreements explicitly states that all operating personnel are employees of the Managing Agent. Hence, pursuant to the state statutory scheme, North Central, and not SPAD, must be considered the employer for the purposes of the MPPAA.
 
 
 21
 The Trustees contend that our requiring an entity to sign a contract explicitly obligating it to provide pension contributions before the entity is an "employer" under the MPPAA would defeat the purpose of ERISA. They argue that true employers will simply require their managing agents to sign all relevant agreements, and then claim no obligation to contribute when the agent withdraws. There is nothing inherently improper in this, however, because parties may contract as they see fit, within certain limitations. A pension plan's proper recourse in such a situation is to assess withdrawal liability against the managing agent. The Trustees further argue that true employers may hire insolvent sham agents, require them to sign all agreements, and thus avoid withdrawal liability. We are not faced with such a situation in this case. There is no evidence in the record that North Central is insolvent. In its Statement of Business Affairs, North Central stated it was not undergoing any bankruptcy proceedings, was not subject to any dissolution proceedings, and was not transferring its assets. Nor is there any evidence that SPAD hired North Central for any improper purpose.[6] Because the case of an insolvent shell agent and a potentially fraudulent arrangement is not properly before us, we leave that issue for another day.
 
 III.
 
 22
 For the foregoing reasons, we hold that SPAD is not an employer under the MPPAA because it was not obligated to contribute to the pension plan. Accordingly, we affirm.
 
 
 
 [1]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [2]
 North Central and SPAD signed seven Managing Agent Agreements in 1977, 1978, 1980, 1981, 1982, 1985 and 1987. All contain substantially the same or identical language
 
 
 [3]
 We do note, however, that if the district court clearly had relied only on state common law to determine that SPAD was an employer under the MPPAA, we might have reversed its order. Courts may rely on state common law to decide some definitional questions under ERISA. For example, we have looked to state common law when determining whether someone is an "employee" under ERISA. See Short v. Central States, S.E. & S.W. Areas Pension Fund, 729 F.2d 567, 572-73 (8th Cir.1984). Reference to common law to determine whether someone is an employee is usually justified by ERISA's lack of a workable definition: "We agree that because Congress provided no specific statutory definition of 'employee' under ERISA we properly apply the common law of agency." Penn v. Howe-Baker Eng'rs, Inc., 898 F.2d 1096, 1102 n. 6 (5th Cir.1990). The circuits that have addressed the definition of employer under ERISA and the MPPAA, however, have uniformly rejected the use of state common law. See Philippines, Micronesia & Orient Navigation Co. v. NYSA-ILA Pension Trust Fund, 909 F.2d 39, 41 (2d Cir.1990) (per curiam) ("[B]y now, it is well-established that the common law definition [of employer] does not control in cases such as this,...."), petition for cert. filed, 59 U.S.L.W. 3352-53 (U.S. Oct. 3, 1990) (No. 90-576); Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n, AFL-CIO Pension Plan & Trust, 896 F.2d 1330, 1343 (11th Cir.1990); Connors v. P & M Coal Co., 801 F.2d 1373, 1377 (D.C.Cir.1986); cf. Scarbrough v. Perez, 870 F.2d 1079, 1082-84 (6th Cir.1989) (refusing to apply employer definition from Fair Labor Standards Act case law to ERISA)
 
 
 [4]
 Our characterization of the Korea Shipping opinion appears to conflict directly with the Eleventh Circuit's characterization of the same case in Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n, AFL-CIO Pension Plan & Trust, 896 F.2d 1330 (11th Cir.1990). In Carriers Container Council, the Eleventh Circuit stated: "The Korea Shipping court held that the Title I definition of 'employer' should apply to the MPPAA...." Id. at 1343. With all due respect to our sister circuit, that is not precisely what the Second Circuit held. After stating that courts should determine the MPPAA's definition of employer, the Korea Shipping court reviewed the MPPAA's policies and purposes and approved a definition of employer based on the definition found in Title I, but not the Title I definition itself. Korea Shipping, 880 F.2d at 1537. The Eleventh Circuit apparently recognized this distinction later in the Carriers Container Council opinion when it stated: "The contributing obligor test drawn from Title I of ERISA...." Carriers Container Council, 896 F.2d at 1343 (emphasis added)
 
 
 [5]
 The only possible contractual provisions the Trustees could cite are found in Article III of the various Managing Agent Agreements. The relevant provisions state: "SPAD will provide Agent with sufficient funds in said accounts to carry on the operations. Agent will have a separate bank account to be called a payroll account into which deposits will be made from the operating account ... to enable Agent to meet its payroll expenses and related fringe benefits." The first provision mentions nothing about pension funds and thus does not create an obligation to contribute. The second provision similarly does not mention pension contributions, although it does mention "fringe benefits." This reference to "fringe benefits," however, does not establish an obligation to contribute to a pension plan. See Carriers Container Council, 896 F.2d at 1344 (stating that withdrawal liability is based on the obligation to contribute to plan "and not on the basis of benefits that the employer promised to supply to plan participants"). Moreover, the second provision clearly states that payroll expenses and fringe benefits are North Central's responsibilities, not SPAD's
 
 
 [6]
 In fact, the statute that created SPAD explicitly permits it to hire a managing agent. See Minn.Stat.Ann. Sec. 469.055(11) (Supp.1990)