John J. CANARIO, et al., as Trustees of the Local 816 Labor and Management Pension Fund, Plaintiffs,

v.

LIDELCO, INC., Defendant.

John J. CANARIO, et al., as Trustees of the Local 816 Labor and Management Pension Fund, Plaintiffs,

v.

Charles A. FRANCOLINI, and Jean Francolini, Defendants.

No. CV–84–4657(CBA).

United States District Court, E.D. New York.

Feb. 4, 1992.

Putney, Twombly, Hall & Hirson, Daniel T. Campbell, New York City, J. Warren Mangan, O'Connor & Mangan, P.C., Long Island City, N.Y., for Canario, et al.

Epstein Becker & Green, by Thomas R. Kelly, New York City, for Lidelco, Inc. and Francolini.

## MEMORANDUM AND ORDER

AMON, District Judge.

## I. INTRODUCTION

Plaintiffs' complaint seeks recovery from the Defendants of the withdrawal liability of Lidelco, Inc. ("Lidelco") pursuant to the Multiemployer Pension Plan Amendment Act ("MPPAA"), 29 U.S.C. § 1381 *et seq.* (1985). The case is currently before the Court on Defendants' Motion for Summary Judgment or, In the Alternative, for an Order Compelling Arbitration.

## II. BACKGROUND

Lidelco was a New York corporation engaged in the trucking industry. Prior to 1977, it maintained its primary terminal on Long Island. At that time, its principals were Richard Kuster, Joan Kuster, Charles Francolini ("Mr. Francolini") and Jean Francolini ("Mrs. Francolini"). Due to deregulation of the trucking industry and an adverse economic climate, Lidelco's business declined dramatically. In 1977 the Company moved its main terminal to New Jersey in order to reduce operating costs. Subsequent to this move, the company redeemed the stock owned by the Kusters, a total of 157½ shares, for $200,000. In 1983 further deterioration of the economic cli-

mate forced Lidelco to cease all operations. Its remaining assets were liquidated. According to Defendants, the liquidation process did not completely pay off the debts of the company and no distribution was made to any shareholder.

On or about March 14, 1983, the Local 816 Labor and Management Pension Trust Fund (the "Fund") mailed a letter to Lidelco at its former address in New Jersey, despite having received notification that all correspondence was to be sent to a Virginia address.[1] The letter was mailed pursuant to 29 U.S.C. § 1399(a) and was designed to inform Lidelco that the Fund had determined that they had withdrawn from the Pension Fund, and were thus potentially liable for withdrawal liability. The letter requested certain information to be used in calculating Lidelco's liability. Plaintiffs have produced a return receipt which bears a signature purporting to be that of Mr. Francolini, but Defendants deny that this is his signature or that he ever received the letter.

The Fund claims that on or about May 26, 1983, it sent a second letter to Lidelco at its New Jersey address informing it that withdrawal liability in the amount of $897,-000 had been calculated. Again, Plaintiffs have a return receipt, and Defendants deny ever having received such a letter.

When no payment was received, a notice of non-payment was sent to Lidelco which was returned "Addressee Unknown". After the required payment was 60 days overdue, the Fund attempted to declare a default pursuant to 29 U.S.C. § 1399(c)(5)(A). The Fund was informed by counsel that this could not be done since the notice of non-payment had never been received by Lidelco. Instead, pursuant to § 1399(c)(5)(B), the Fund declared a default on the grounds that Lidelco did "not have the financial ability to make full payment of their withdrawal liability under the

---

1. The parties had been involved in a prior matter dealing with Lidelco's obligations to make contributions to the Fund. This litigation was settled and a Stipulation of Settlement signed on September 15, 1980, which directed that all cor-

schedule of payments".[2] *Savitt Affidavit*, Exh. G at 3.

Plaintiffs commenced suit against Lidelco on or about December 11, 1984, by serving the New York Secretary of State. No notice was sent to Lidelco as the summons was returned to the Secretary of State marked "Addressee Unknown". *Savitt Affidavit*, Exh. Y. A default judgment on this complaint was obtained by Plaintiffs on May 16, 1985, in the amount of $1,242,-212.50.

On July 24, 1986, an action was commenced against Charles and Jean Francolini seeking to hold them personally liable on the default judgment. According to Defendants, this was the first time that the Fund asserted personal liability on the part of the Francolinis. The claim was that Charles and Jean Francolini were "employers" within the meaning of the ERISA statute.

Lidelco moved to vacate the default judgment on December 5, 1986, claiming that the first time they received notice of that action was when the Francolinis were served. The two actions were consolidated, and on July 23, 1988, the default judgment was vacated by the Honorable Joseph M. McLaughlin.

While the instant suit was pending, the Fund informed Charles and Jean Francolini, by a letter dated December 15, 1989 (attached to Plaintiffs' *Memorandum in Opposition* as Exhs. 1 and 2), that "your shareholder status with Lidelco, Inc. ... and your relationship to the Fund on behalf of Lidelco, brings you within the definition of 'employer', as defined in Section 3(5) ... and subjects you, jointly and severally with Lidelco, to satisfy the withdrawal liability obligation that Lidelco has to the Fund." *Plaintiffs' Memorandum of Law in Opposition*, Exh. B. This letter purports to serve as a notice of non-payment, such that the Francolinis' failure to respond and

make payment within 60 days constitutes a default. No default has, however, been declared by the Fund.

## III. DISCUSSION

Defendants move for summary judgment on several grounds. Defendant Lidelco claims it is entitled to summary judgment because: (1) the jurisdictional requirements of ERISA have not been complied with; (2) Plaintiffs have failed to comply with the express requirements of the statute; and (3) the liquidation liability of Lidelco is in fact zero. The individual defendants claim summary judgment is appropriate in that: (1) they are not "employers" within the meaning of the statute; (2) the individual defendants have never been found to be in default; and (3) the default judgment on which the complaint is based has been vacated.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eastman Machine Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). No genuine issue exists:

> unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). In making this determination, the

---

respondence with Lidelco or the Francolinis be directed to a Charlottesville, Virginia address.

**2.** The Court notes that 29 U.S.C. § 1399(c)(5)(B), requires a pension fund to adopt rules regarding the declaration of default on these grounds. The Fund adopted its rule immediately before it

declared Lidelco in default and the minutes of the Fund's Board meeting make clear that the purpose of adopting the rule was to allow the Fund to declare Lidelco in default. *See Savitt Affidavit*, Exh. G at 2–3.

court is required to view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In addition, summary judgment is appropriate against a non-movant who, after adequate time for discovery, fails to establish the existence of an element that is essential to his case and on which he will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552; *United States v. Pilot Petroleum Associates, Inc.,* 712 F.Supp. 1077, 1081 (E.D.N.Y. 1989). The Court will address each of Defendants' contentions in light of these well-settled principles.

### A. Lidelco

#### 1. *Satisfaction of Jurisdictional Prerequisites*

The gravamen of Lidelco's argument is that as a prerequisite to bringing suit, the MPPAA requires the Fund to adhere to a specific schedule of notice before imposing withdrawal liability or declaring a default, and that the Fund in this instance never provided Lidelco with the required statutory notice.

Judge McLaughlin described the operation of the MPPAA scheme in his order of May 26, 1987, vacating the default:

The MPPAA provides a comprehensive scheme to determine the liability of an employer who withdraws from a multiemployer pension plan. *See* 29 U.S.C. § 1381(a). Once an employer withdraws, the plan sponsor must calculate the employer's withdrawal liability. *See id.* § 1382. The sponsor must then notify the employer of the amount of such liability and demand payment. *See id.* § 1399(b)(1). The employer then has 90 days in which to request review of the sponsor's determination. *See id.* § 1399(b)(2)(A). Upon such a request the sponsor must conduct a review and notify the employer of its decision and the basis for the decision. *See* 29 U.S.C. § 1399(b)(2)(B). If a dispute arises, either party may initiate an arbitration proceeding within 60 days of the earlier of (1) the sponsor's notification of the employer of the basis for its decision, or (2) 120 days after the employer's request for such a decision. *See* 29 U.S.C. § 1401(a)(1). If arbitration is not initiated, the amount determined by the plan sponsor is considered due and owing and the sponsor may sue in federal or state court for collection. *See id.* § 1401(b)(1).

*Canario v. Lidelco, Inc.,* CV–84–4657 (E.D.N.Y. May 26, 1987) (McLaughlin, J.).

■ Lidelco is correct in its assertion that compliance with the statutory notice requirements is a prerequisite to collection on a suit to recover withdrawal liability. *Trustees of Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transport, Inc.,* 888 F.2d 1161, 1163 (7th Cir. 1989); *Teamsters Pension Trust Fund Board of Trustees of Western Conference v. Allyn Transp. Co.,* 832 F.2d 502, 506 (9th Cir.1987); *Debreceni v. George Lamoureux & Co.,* 629 F.Supp. 598, 601 (D.Mass.1986) ("notice requirement set forth in 29 U.S.C. § 1399(b)(1) is a precondition to suit in federal court.").

■ The question then, is whether Lidelco did in fact receive notice of its withdrawal liability so as to have an opportunity to contest the determination and, if necessary, seek arbitration. *See ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879, 881 (2d Cir.1988) (disputes over withdrawal liability are to be resolved through arbitration as mandated by the statute).

It is uncontested that on March 14, 1983, the Fund mailed to Lidelco at its New Jersey address a letter, by certified mail

return receipt requested, requesting information regarding calculation of Lidelco's withdrawal liability. It is also uncontested that on May 26, 1983, the Fund mailed to Lidelco, again at its New Jersey address, and again by certified mail return receipt requested, a letter demanding payment of $897,000, which the Fund had determined to be the amount of Lidelco's withdrawal liability. What is contested, is whether Lidelco or anyone who could be charged with knowledge received those letters. Defendants offer the Affidavit of Jean Francolini which states that she never received either letter. *Affidavit of Jean Francolini* at 1. In addition, Defendants have submitted an Affidavit of Charles Francolini dated January 1987, which was prepared in the course of Defendants' Motion to Vacate the Default Judgment, in which he states he never received either of the two letters sent by the Fund, and that the signature on the June 21st card is not his.[3] *Defendants' Notice of Motion,* Exh. A at 1–2. Mr. Francolini does state that the signature on the June 21 card appears to be that of his daughter, Lisa Francolini, who resides at his home. He goes on to say, however, that he has questioned his daughter regarding the matter, and that she had no recollection of having signed for such a letter. Plaintiffs point to the return receipt cards received by the Fund and attached to the Affidavit of Marie Tarnopal, Manager of the Fund. These cards are dated March 26, 1983, and June 21, 1983, respectively. The earlier card bears a signature which purports to be that of Charles Francolini. The later card has the signature "C. Francolini". The two signatures are significantly different in their appearance from one another. In addition the card dated June 21, 1983, bears a Charlottesville, Virginia postmark dated June 21, 1983.

Taking the facts in a light most favorable to the non-moving party, *Adickes v.*

*S.H. Kress and Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), summary judgment should be denied on this first ground. One could conclude that at the very least the May 26 letter, the notice of liability, was sent to Lidelco in New Jersey and forwarded to Charlottesville, Virginia where it was delivered to the location specified by Lidelco in its change of address form, namely the Francolini home. A signature appears on the card which Mr. Francolini admits could be that of his daughter. These facts raise a genuine issue of material fact on the issue of whether the Francolinis received notice on behalf of Lidelco.[4]

### 2. *Disregard of ERISA Requirements*

Lidelco's second argument is simply a repetition of the previous argument regarding the Fund's failure to provide proper notice. Lidelco argues that the Fund so callously disregarded ERISA's procedural requirements as to bar recovery. Lidelco is correct when it states that the Fund was advised that all correspondence was to be sent to the Virginia address. However, even taking this as true, Lidelco has not provided support for the argument that forfeiture should be imposed for the Funds' failure to send notice to the most recent address on file. As discussed above, the issue is whether notice was ever received, and this is a question of fact not appropriate for resolution on summary judgment.

### 3. *Amount of Withdrawal Liability*

Lidelco argues that the action should be dismissed since, in any event, its withdrawal liability is in fact zero. In the first instance, if Lidelco's liability is actually zero, Lidelco was required to raise this challenge within 60 days after receiving notification of its determined withdrawal liability or be barred from challenging the determination. *In re Centric Corp.,* 901 F.2d 1514, 1518 (10th Cir.1990) (failure to

---

**3.** The Affidavit does not discuss the return receipt card for the earlier letter, although Francolini does deny having received the earlier letter.

**4.** Despite repeated questioning at oral argument, Defendants did not specify what would

constitute sufficient "notice" to Lidelco. The Court will assume that if the letter was received by Charles or Jean Francolini this would suffice to notify Lidelco, given the ownership relationship between the Francolinis and the corporate entity.

arbitrate merits, as opposed to procedural aspects, of Funds decision bars challenge); *Combs v. Leischman,* 691 F.Supp. 424 (D.D.C.1988). Thus for the instant motion, this issue need not be resolved since there is a disputed question of fact regarding notice which requires resolution. However, even if the Court were to find that notice was improper, and the Fund's determination was subject to challenge, there is considerable doubt as to whether Lidelco's assertion is correct.

The MPPAA provides for special relief for employers in economic distress. Lidelco claims that 29 U.S.C. § 1405, limits the withdrawal liability of Lidelco to 30 percent of its liquidation value, and that the undisputed liquidation value of Lidelco is zero. Therefore, Lidelco argues, its withdrawal liability is zero. Lidelco claims that arbitration of the dispute would have resolved this issue, but that it never sought arbitration because it never received notice.

Section 1405(a)(1) provides that in the case of bona-fide arms-length sale of all or substantially all of the assets of an employer the unfunded vested benefits allocable to an employer,[5] other than an employer undergoing reorganization, shall not exceed the greater of:

(A) a portion (determined under paragraph (2)) of the liquidation or dissolution value of the employer (determined after the sale or exchange of such assets), or

(B) the unfunded vested benefits attributable to employees of the employer.

*Id.* Section 1405(a)(2) does limit Lidelco's liability to 30 percent of the liquidation value. But, neither Lidelco nor the Fund has addressed the question of whether the

calculation under § 1405(a)(1)(B) would be greater than zero, the amount calculated under § 1405(a)(1)(A). If such was the case that amount would be the reduced withdrawal liability.

Moreover, it is not clear that § 1405(a) applies in this instance. The Ninth Circuit has held that where a business is insolvent at the time withdrawal liability is imposed it is not § 1405(a) which applies, but rather § 1405(b), which deals with reduction of withdrawal liability for insolvent employers. *Trustees of Amalgamated Insurance Fund v. Geltman Industries,* 784 F.2d 926, 929 (9th Cir.1986). "An employer is insolvent if the liabilities of the employer, including withdrawal liability under the plan ... exceed the assets of the employer (determined as of the commencement of liquidation of dissolution)...." 29 U.S.C. § 1405(d)(1). The record indicates that Lidelco was insolvent under this definition at the time withdrawal liability was imposed. Under § 1405(b) Lidelco's liability would likely be reduced, but would not be eliminated.[6]

In sum, summary judgment is denied as to Lidelco's third ground since the Court must first resolve the question of whether notice was received. Moreover, as the above analysis makes plain, it does not appear that Lidelco would be found to have zero withdrawal liability.

## B. The Individual Defendants

The Plaintiffs' complaint against the individual defendants alleges two causes of action. First, the Fund claims that the Francolinis are "employers" within the

---

**5.** This is the technical definition of withdrawal liability.

**6.** Under 29 U.S.C. § 1405(b):

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1) 50 percent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and

(2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1))

which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

*Id.* The Court cannot find any specific figures as to the exact assets and liabilities of Lidelco at the time of liquidation but the affidavit of Charles Francolini suggests Lidelco was insolvent even excluding the impact of the imposition of withdrawal liability.

meaning of the statute and thus are subject to suit for collection of Lidelco's withdrawal liability. Second, the Fund claims that under "all the facts and circumstances of the instant case and pursuant to the legislative purpose of ERISA, Defendants are personally liable to the Fund for Lidelco's withdrawal obligation as a matter of federal common law."[7] *Complaint*, CV–86–2462, at ¶ 18. Defendants' response is that the Francolinis are not "employers"; that the Francolinis never received the required statutory notice; and that the vacating of the default judgment requires judgment in their favor.

### 1. *Definition of "Employer"*

Under the MPPAA an "employer" has an obligation to pay its withdrawal liability. Plaintiffs claim that the individual defendants are "employers" within the meaning of the statute and thus are obligated on Lidelco's liability. The Second Circuit has not yet decided what standard is to be used in determining whether individual shareholders and officers of a corporate entity are "employers" within the meaning of the act. Plaintiffs claim, without citing any authority, that the Second Circuit is likely to adopt either the "obligated to contribute" test or "piercing the corporate veil" test, and under either, the Francolinis are "employers".

Defendants argue that ordinarily individual shareholders or officers of a corporation are not personally liable for withdrawal liability as they are not "employers" within the meaning of the statute. *See Scarbrough v. Perez*, 870 F.2d 1079, 1082 (6th Cir.1989); *DeBreceni v. Graf Bros. Leasing, Inc.*, 828 F.2d 877, 881 (1st Cir. 1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988); *Solomon v. Klien*, 770 F.2d 352, 354 (3d Cir.1985); *Combs v. Sun–Up Coal Company Inc.*, 634 F.Supp. 13, 15–19 (D.D.C.1985).

### a. 29 U.S.C. § 1002(5): Obligation to Contribute

Plaintiffs advance two arguments. The first seeks to base liability on an "obligation to contribute". Under 29 U.S.C. § 1002(5), an employer is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan...."[8] From this, Plaintiffs jump to 29 U.S.C. § 1383(a) which defines a withdrawal:

> For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation to contribute under the plan; or
>
> (2) permanently ceases all covered operations under the plan.

*Id.* According to 29 U.S.C. § 1392(a):

> For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising—
>
> (1) under one or more collective bargaining (or related) agreements, or
>
> (2) as a result of a duty under applicable law,
>
> but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

*Id.* Plaintiffs maintain that the individual defendants assumed an indirect "obligation to contribute" to the Fund when they signed the 1980 Stipulation of Settlement. *Affirmation of Mangan*, Exh. 1. In that stipulation, Charles and Jean Francolini personally guaranteed that delinquent payments to the Fund would be paid. Thus, according to the Fund, when Lidelco ceased operations, it and the Francolinis ceased having an obligation to contribute and had therefore withdrawn from the pension plan, and were accordingly liable for withdrawal liability.

Even if Plaintiffs are correct in their analysis of the law, it is plain to this Court that the Francolinis are not liable, since they did not have an obligation to

---

**7.** Plaintiffs never explain exactly what federal common law they are relying upon. A review of the Fund's brief indicates that this claim is merely a restatement of the argument in favor of piercing the corporate veil, discussed *infra*.

**8.** The complaint refers to section 1001(3). No such section exists however, and the definition used by Plaintiffs comes from section 1002.

contribute within the meaning of 29 U.S.C. § 1392(a). The Francolinis' guarantee is not claimed to be an obligation arising under a collective bargaining agreement, nor under applicable labor-management law, but rather it arose from a voluntary agreement. Moreover, § 1392(a) specifically excludes obligations to pay delinquent contributions.[9] The Francolinis had no "obligation to contribute" as defined by the MPPAA. *See Korea Shipping Corp. v. New York Shipping Association,* 880 F.2d 1531 (2d Cir.1989).

■ In addition, even if the Francolinis did have a statutory "obligation to contribute", the theory espoused by Plaintiffs has not been applied by any court so as to hold an individual shareholder or officer liable for the withdrawal liability of a corporation. The Second Circuit has held that the "obligation to contribute" definition contained in 29 U.S.C. § 1392(a) is to be used in determining whether a business entity is responsible for withdrawal liability, but has not applied, nor indicated that it would apply such a definition to individual shareholders or officers of a corporation. *Korea Shipping Corp. v. New York Shipping Association,* 880 F.2d 1531, 1537 (2d Cir. 1989). *See also Bowers v. Transportation Maritima Mexicana, S.A.,* 901 F.2d 258 (2d Cir.1990). In these cases, the court held that a shipping company that was responsible for pension contributions was an "employer" despite the fact that the longshoreman were not employed directly by the company, but by stevedore companies. In the instant case it was Lidelco who was the party required to make the pension contributions.

Furthermore, to the extent Plaintiffs' theory relies upon the definition of "employer" contained in § 1002(5) the Court finds the argument to be without merit. Plaintiffs' brief cites no authority for its assertions, and most courts that have examined the question have held that absent a "piercing of the corporate veil", the definition of employer in § 1002(5) cannot serve as a basis for implying individual liability for a corporation's withdrawal liability. *See Scarbrough v. Perez,* 870 F.2d at 1082; *DeBreceni v. Graf Bros. Leasing, Inc.,* 828 F.2d at 881; *Solomon v. Klien,* 770 F.2d at 354; *Combs v. Sun–Up Coal Company Inc.,* 634 F.Supp. at 15–19.

In *Combs v. Sun–Up Coal Co., Inc.,* 634 F.Supp. at 15–19, the court expressly rejected an attempt to imply individual liability based upon the definition contained in § 1002(5). As the court noted in *Combs,* the definition in § 1002(5) is expressly limited by the introductory phrase appearing at the beginning of § 1002, "For purposes of this subchapter...." Thus the definition relied upon by Plaintiffs for their obligation to contribute theory, by its terms, applies only to subchapter I of ERISA, and not subchapter III, the subchapter at issue here. *Id.* at 15. *See also Nachman Corp. v. PBGC,* 446 U.S. 359, 370, 100 S.Ct. 1723, 1730, 64 L.Ed.2d 354 (1979); *Korea Shipping Corp. v. New York Shipping Association,* 880 F.2d 1531, 1536 (2d Cir.1989) (definition of employer "is one that in the final analysis must be left to the courts"); *DeBreceni v. Graf Bros. Leasing, Inc.,* 828 F.2d 877, 880 (1st Cir.1987), *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988).

Those courts that have imposed individual liability under ERISA have generally done so in the context of a suit to compel contribution to a pension fund, an action governed by subchapter I of ERISA.[10] *Donovan v. Agnew,* 712 F.2d 1509 (1st Cir.1983); *Massachusetts State Carpenters Pension Fund v. Atlantic Diving Co.,* 635 F.Supp. 9 (D.Mass.1984). As the court noted in *Atlantic Diving,* the circumstances surrounding a failure to pay pen-

---

**9.** It is worth noting that in quoting § 1392 in their brief Plaintiffs have rearranged the paragraph break so that the phrase dealing with delinquent contributions appears to apply only to § 1392(2). *Memorandum in Opposition,* at 4. The exclusion applies to all of § 1392.

**10.** The First Circuit has on occasion adopted an "economic realities" test in determining who is an "employer". *See Donovan v. Agnew,* 712 F.2d 1509 (1st Cir.1983). The use of this test, however, has generally been restricted to cases involving contribution liability and not withdrawal liability.

sion fund contributions is usually quite different from the circumstances surrounding the imposition of withdrawal liability. *Id.* at 12–14.

The *Combs* court pointed to two opinion letters of the PBGC to support its finding that individual liability was not to be imposed based upon an application of § 1002(5). In one the PBGC stated that:

> ERISA has no special rules regarding shareholder or officer liability ... [Rather], this issue is usually determined by state law which provides that shareholders are not liable for the debts of a corporation. You should, however, be aware that the laws of every state contain exceptions to this general principle.

*Combs*, 634 F.Supp. at 15 (*quoting PBGC Opinion Letter*, 82–038 (Dec. 14, 1982) (*quoted in Atlantic Diving*, 635 F.Supp. at 14). Although this letter does not foreclose the possibility of individual liability, it suggests that the proper avenue of imposition of such liability is through state law, such as "piercing the corporate veil". The *Combs* court did point to a subsequent opinion letter which suggested that the definition in § 1002(5) might be appropriate in determining "whether a *business* is liable" under subchapter III for withdrawal liability. *Combs*, 634 F.Supp. at 15 (*citing PBGC Opinion Letter*, Dec. 27, 1984) (emphasis in original). The PBGC made clear, however, that this "borrowing" was only appropriate to the extent that the purposes of the different subchapters do not conflict. This Court finds, as did the *Combs* court, that the policies behind the imposition of withdrawal liability differ significantly from the policies supporting subchapter I. The imposition of withdrawal liability is done without regard to fault on the part of any individual officer or shareholder. Contribution cases on the other hand, arise after a failure of the corporation to meet its obligations and can often be blamed upon the acts or omissions of an individual. *Id.* at 16.

Had Congress desired to hold individuals responsible for withdrawal liability, it was capable of doing so. Instead, the statute contains provisions which indicate an intent to limit liability to the business entity. 29 U.S.C. § 1405, which Lidelco relies upon in an attempt to limit its liability, provides for the reduction of withdrawal liability in the case of a sale of assets or insolvency of a business. It would indeed be odd for Congress to intend to impose personal liability and at the same time provide for the reduction of withdrawal liability because of events relevant only to the business entity. In addition, § 1405(c) provides that where the business entity is a partnership or sole proprietorship, property which would be exempt under 11 U.S.C. § 522 (the Bankruptcy Code), is not available for satisfaction of withdrawal liability. If, as Plaintiffs contend, individuals are liable for a corporation's withdrawal liability, the statute would provide an individual with greater personal protection when operating his business as a sole proprietorship, as compared to when operating it as a corporation. *Combs*, 634 F.Supp. at 17. Congress clearly did not intend such an incongruous result. As the *Combs* court wrote:

> To be sure, the legislative history reveals that Congress was concerned that the term "employer" be construed in a manner consistent with the Act and its purpose, and that employers not be able to evade or avoid withdrawal liability through changes in identity, form of control, or through transactions which were not bona fide or at arm's length. See 126 Cong.Rec. H 7898 (daily ed. August 26, 1980); 126 Con.Rec. S 10105 (daily ed. July 29, 1980). However, to accomplish this goal, congress adopted specific provisions to guard against such maneuvers. See, *e.g.* section 4212(c), 29 U.S.C. 1392(c) (transaction to be ignores for purposes of applying subchapter III); section 4218, 29 U.S.C. § 1398 (withdrawal from plan does not occur when employer changes its corporate structure or business form). Moreover, section 4001(b)(1), 29 U.S.C. § 1301(b)(1), specifies that in the case of a sole proprietorship and partnership, the sole proprietorship and the partnership, respectively, are treated as a single employer for purposes of subchapter III. There is nothing in the language which indicates that Congress intended the cor-

porate identity be disregarded and corporate officers and shareholders held personally liable for withdrawal liability. *Combs*, 634 F.Supp. at 17.

■ Further, in those cases where a court has looked to § 1002(5) for the definition of "employer" in the context of withdrawal liability, it has almost uniformly been the case that the definition was being used as to corporate or business entities, rather then individuals. *See Korea Shipping*, 880 F.2d at 1537; *PBGC v. Ouimet Corp.*, 630 F.2d 4 (1st Cir.1980); *Connors v. Calvert Development Co.*, 622 F.Supp. 877 (D.D.C.1985); *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F.Supp. 996 (E.D.Pa. 1985).

Accordingly, the Court finds that Congress did not intend to impose individual liability for a corporation's withdrawal liability absent circumstances which would permit a "piercing of the corporate veil".

b. Piercing the Corporate Veil

■ Plaintiffs' second argument in support of their claim that the Francolinis bear personal liability is that Francolinis were alter egos of Lidelco and the Court should "pierce the corporate veil" to hold the Francolinis personally responsible. Under the alter ego theory, where a corporation is being operated by an individual in such a manner as to render the corporate form a fiction, the courts will pierce the corporate veil so as to hold the individual officer or shareholder responsible for the obligations of the corporation. *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1230 (E.D.N.Y. 1978), *aff'd*, 599 F.2d 34 (2d Cir.1979). Plaintiffs claim that Lidelco was merely a corporate shell for the Francolinis' attempt to escape personal liability. The Fund also alleges that the Francolinis engaged in business transactions with Lidelco that were fraudulent and that the Francolinis were personally obligated to pay the corporations debts, making clear there was no separate corporate identity.

Plaintiffs fail to articulate any standard as to how the Court is to determine whether to pierce the corporate veil, saying that the Second Circuit has not yet determined

the appropriate standard. Nevertheless, Plaintiffs go on to claim, based upon *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383 (2d Cir.1989), that the traditional common law standard need not be satisfied, and some less stringent standard will suffice. Individual liability in *Leddy* was, however, not premised upon a finding that the individual, Gedell, was the alter ego of the corporation, but upon the broad definition of "employer" applicable in pension fund contribution cases, but not in withdrawal liability cases. *Id.* at 387. Also of note, was the finding that Gedell had been indicted and convicted of a criminal conspiracy to defraud the pension fund, a situation not present in the instant case.

■ The proper criteria in determining whether the corporate veil should be pierced include: "(1) the absence of formalities which are the part and parcel of normal corporate existence, i.e., the issuance of stock, election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetration of fraud by means of the corporate vehicle." *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984). *See also Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.*, 702 F.Supp. 1005 (S.D.N.Y.1988) (to pierce corporate veil both domination and fraud must be proven); *United States v. Cohn*, 682 F.Supp. 209 (S.D.N.Y.1988) (corporate form may be disregarded to prevent a fraud or achieve equity); *Brunswick Corp. v. Waxman*, 459 F.Supp. at 1229 (E.D.N.Y.1978) (use of domination and control over corporation to commit a fraud justifies piercing the corporate veil). Plaintiffs bear the burden of proving that the corporate veil should be pierced. *Brunswick Corp. v. Waxman*, 459 F.Supp. at 1229.

■ The Plaintiffs have submitted the affidavit of Attorney J. Warren Mangan and a Statement, Pursuant to Local Rule 3(g), of Contested Facts. These documents allege various business transactions between Lidelco and the Francolinis and the Kusters. No evidence is presented, how-

ever, which would suggest an absence of corporate formalities, inadequate capitalization or the perpetration of fraud by means of the corporate vehicle. *See Walter E. Heller & Co.*, 730 F.2d at 53. The only allegation of any substance is contained in ¶ 20 of the *Mangan Affidavit*, which alleges that Charles Francolini purchased a plane using corporate funds and took personal income tax deductions for its depreciation while Lidelco paid for its upkeep. Mangan further claims the plane was sold and Lidelco received none of the proceeds. The Fund has, however, not provided any corroboration for these accusations. Mangan has no personal knowledge of these events and no receipts or records have been produced by the Fund. In any event, even if these allegations were substantiated, the Court does not find that they rise to the level necessary to pierce the corporate veil.

▆▆▆ In addition, the Fund claimed at oral argument that the fact that the Francolinis' personally guaranteed loans made to the corporation and guaranteed, pursuant to the 1980 settlement agreement, that contributions would be made to the Fund, serves to prove that Lidelco was simply an alter ego of the Francolinis. However, an opposite view is equally viable. The rationale behind piercing a corporate veil is that an individual has used the corporate entity for solely personal purposes and disregarded the corporate form. The sole purpose of the corporation in such a situation is an effort to avoid personal liability on the part of the individual. Here, there is no evidence that the Francolinis' were using Lidelco to avoid personal liability, they were in fact subjecting themselves to potential liability by guaranteeing those loans.

Accordingly, the Court finds that the Francolinis' are not liable for Lidelco's withdrawal liability under an alter ego or fraudulent conveyance theory.

### 2. *Failure to Provide Notice*

▆▆▆ If the Court had found Charles and Jean Francolinis to be "employers," they would have been entitled to statutory no-

tice. In *Connors v. Peles*, 724 F.Supp. 1538, 1571 (W.D.Pa.1989), the court said that even if the plaintiff could show that the individual defendants were the alter ego of the corporation they would need to demonstrate that they were provided with statutory notice. The court there said that notice addressed solely to the corporation was insufficient as regards the individual shareholders of the close corporation.

In this case the only notice received by the Francolinis was the two December 15, 1989, letters mailed to Jean and Charles Francolini respectively, in Charlottesville. These letters notified Jean and Charles that the Fund had determined that their relationship to Lidelco made them personally liable and that since no payment had been made they had 60 days to cure the default by tendering full payment. In the first instance, the statute does, as Defendants note, require the Fund to notify the employer, as soon as practicable after the employer's withdrawal, of the amount of the withdrawal liability and the schedule of payment. 29 U.S.C. § 1399(b)(1). The employer then has a right to contest the determination, proceeding to arbitration if necessary. Here, the Fund failed to comply with the statute at all, let alone as soon as practicable after withdrawal. The December 15 letter was in fact a notice of nonpayment, and not the notice of liability required by § 1399(b)(1).[11] Charles and Jean Francolini never had the opportunity to challenge the assessment of liability since they never received individual notice.

▆▆▆ It is true that most courts hold that notice to one corporate entity of a control group serves as notice to all members of the control group. *Chicago Truck Drivers v. Central Transport*, 888 F.2d at 1163; *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d 118 (3d Cir.1986). This is generally held to be consistent with the dictates of 29 U.S.C. § 1301(b)(1) that entities under common control be treated as a single employer. Although this reasoning may be appropri-

---

11. This is apparent when the December 15 letter is compared to the May 26, 1983, Notice of Liability, sent to Lidelco, pursuant to 29 U.S.C. § 1399(b). *Savitt Affidavit*, Exh. D.

ate for dealing with multiple corporations, it does not transfer to individuals. The Court finds it to be apparent that Lidelco, Jean Francolini and Charles Francolini are separate entities, and accordingly entitled to separate notice.

### 3. *Effect of Vacating the Default Judgment*

Defendants' final argument is that since the complaint against the individual defendants is based upon the default judgment being entered against Lidelco, the vacating of that judgment should result in dismissal of the complaint. As the Court has already found that there exists grounds for summary judgment, it is not necessary to consider this issue.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is DENIED as to Lidelco, Inc., and GRANTED as to the individual defendants, Charles and Jean Francolini. The Clerk shall enter judgment accordingly.

SO ORDERED.